**HERNANDEZ**
v.
**SOUTHERN UNION GAS CO.**
No. 4730.

United States Court of Appeals,
Tenth Circuit.
Jan. 28, 1954.

against Southern Union Gas Company, herein referred to as the company, to recover damages for the alleged wrongful death of Bertha Mae Garcia, a minor child of Albert Garcia and his wife. The complaint alleged that the company was engaged in furnishing natural gas for heating and other purposes in the City of Albuquerque, New Mexico and vicinity; that it knew or had reason to know, that certain appliances in the dwelling house where decedent lived were improperly installed or vented; and that it carelessly and negligently connected gas to said appliances which brought about a condition causing the death of the decedent. The case was tried to the court without a jury. It found that plaintiff had failed to prove that the negligence of the company was the proximate cause of the death of Bertha Mae Garcia. This appeal is from the judgment entered upon that finding.

On January 9, 1952, Albert Garcia, his wife and four children moved into a small home on the outside of the northerly limits of the City of Albuquerque, New Mexico. On that date a plumber installed a gas cook stove in the kitchen of the home, checked a hot water heater and a small open-face ventless heater located in the living room. There were no other heating facilities in the house. The Garcias were not at home and the plumber left a note warning them that heaters of this type were dangerous. On the same day, upon request, the gas company sent a service man to connect the gas with all the appliances in the house. The service man also warned Mr. and Mrs. Garcia that this type of heater was dangerous. He made the connection with the understanding that it would be replaced as soon as possible and would not be used at night or without open windows. He then adjusted the heater to burn properly and planned to return within a few days to see if a new heater had been installed.[1] The

Arturo G. Ortega, Silver Springs, Md., (Joseph L. Smith, Albuquerque, N. M., on the brief), for appellant.

J. C. Ryan and A. H. McLeod, Albuquerque, N. M., for appellee.

Before HUXMAN, MURRAH and PICKETT, Circuit Judges.

PICKETT, Circuit Judge.

The administratrix of the Estate of Bertha Mae Garcia brought this action

1. The service man was called as a witness for the plaintiff and testified as follows: "Q. All right. Now, did you then examine this open-face heater we are referring to?—A. I ran the open-face heater and checked it.

witnesses agree that such heaters are widely used and are not dangerous if properly adjusted. There was a shut-off valve on the heater and also a needle valve to control the flow of gas and air into the heating unit, but there was no gas stop-valve on the line leading away from the heater. The needle valve was covered with a small metal cap which could be easily removed and the gas intake to the heater adjusted with a screw-driver or other small tool. When the heater was in proper adjustment it burned a low blue flame. If adjusted to per-

"Q. And in your opinion as an expert, was that flame in that heater working correctly at the time you left? Was the combustion correct?—A. Yes, sir.

"Q. How was it burning there; what color, if you know?—A. A blue flame.

"Q. If it had been burning an orange or red flame, what would you have done?—A. I would have cut the gas down and let in more air.

"Q. Now, as a matter of fact, Mr. Owens, on the 9th of January, 1952, you had no say so about a heater of this kind, did you?—A. No, sir.

"Q. As a matter of fact, there were thousands of open-face heaters in the city of Albuquerque, weren't there?—A. Yes, sir.

"Q. And you ran into them all the time, didn't you?—A. Yes, sir.

"Q. And there was no law that required those open-face heaters had to be vented, was there?—A. No, sir.

"Q. Did you notice a hole right by that heater that went into the wall?—A. Yes, sir.

"Q. This particular heater would not have fitted against that?—A. No, sir.

"Q. This heater wasn't so constructed it could be used with a vent?—A. No.

"Q. Was the reason you thought you should have this heater turned off because of the fact that it didn't have what you call a gas stop on it?—A. Yes.

"Q. When we talk about a gas stop we mean a stop back in the line away from the heater that has a knob on it so that you can turn it off or on?—A. Yes.

"Q. This heater didn't have that on it?—A. No, sir.

"Q. Did this heater have a valve on it you could turn off and on the gas in the heater itself?—A. Yes, sir.

"Q. And was it working or not?—A. Yes.

"Q. Did you try that?—A. Yes, sir.

"Q. Nothing wrong with that?—A. No, sir.

"Q. Did this heater have a valve that you could use for adjustment purposes?—A. Yes.

"Q. What kind of valve was that, if you know, Mr. Owens?—A. The valve has a needle seat to adjust the gas through the orifice.

"Q. Through the orifice, do you call it?—A. Yes, sir.

"Q. Do some of these heaters have that valve out where they may be turned by hand without removing the little cap?—A. Yes.

"Q. Do you recall whether that had a cap that could be removed?—A. It had a cap on it.

"Q. But a child could take the cap off by unscrewing with finger and thumb?—A. Yes.

"Q. And after that cap is off, you take a screwdriver, and there is a mechanism in there to turn either up or down?—A. Yes.

"Q. And this had that on it?—A. Yes.

"Q. And what would be the result if someone not acquainted with a heater of that kind had taken the cap off and taken a screwdriver or knife and turned on too much air for the gas being used? What would happen?—A. If they turned it and put more gas on and no more air, it would fume so that the fumes would cause carbon monoxide.

"Q. And if adjusted by someone that didn't know about it, it would throw off carbon monoxide?—A. Yes, sir.

\* \* \* \* \*

"Q. Now, did you have any conversation there with Mr. and Mrs. Garcia the day you were there?—A. Yes.

"Q. What conversation did you have with them?—A. I told them about this circulating heater, and advised him how to use it until he could get a vented-type heater put in.

"Q. What did you tell him, Mr. Owens?—A. I told him to raise the windows in the living room, and not use that heater at night, to turn it off.

"Q. And what did he say to that?—A. He said he would.

"Q. And was Mrs. Garcia present at that time?—A. Yes.

"Q. Were the children present at that time?—A. Three of them.

"Q. Three of the children were present at that time. And Mr. Garcia told you then he would not use that heater at night?—A. Yes, sir.

"Q. He told you he wouldn't use it in the daytime without raising the windows?—A. Yes."

mit the use of more gas than the heater was designed for, a yellow or orange colored flame would result and would indicate the creation of carbon monoxide gas. When the service man left the Garcia home the heater was burning a low blue flame and was in proper adjustment. At about 10 o'clock on the night of June 12, 1952, relatives and neighbors went to the Garcia home and found the entire family in beds and either dead or dying. In addition to the hot water heater, all of the burners on the cook stove were burning except in the oven. The small heater in the living room was found to be using about 80% more gas than it was designed to use, and a yellow flame was burning up through the top of the heater radiants and creating poisonous carbon monoxide gas. All of the windows and doors were closed except one in the kitchen which was open about one and one-half inch. Upon these facts the court declined to find that the gas company was negligent and ruled that the evidence as a whole failed to establish, "that the negligence of the defendant, if any, was the proximate cause of the death of the plaintiff's decedent." The trial court was apparently of the view that the death was the result of some cause intervening after the gas was connected.

The plaintiff contends that the gas company knew that there was no vent or safety cock on the heater, and knew that under the conditions existing that the use of the heater was dangerous; and that "Under this set of facts, a gas company supplying gas to consumers is negligent as a matter of law", even though it did not own and had not installed the appliances. We do not believe the law of New Mexico places any such liability upon the distributor of gas. To so hold would make a gas company virtually an insurer against all damages resulting from the use of gas regardless of the fault of the company. Gas, of course, is inherently dangerous when used in any appliance unless it is properly used and necessary safeguards are exercised by the user. If, without the knowledge of the company, the user creates a dangerous condition by the improper use of appliances which the company has not installed and over which it has no control, there is no liability. Cases collected, 138 A.L.R. 883. This is not a case where gas was delivered to an appliance with a known defect as in the cases relied upon by the plaintiff.[2] The witnesses all agree that the danger was not due to any defect in this particular heater but that it is a type which is widely used and which becomes dangerous only when out of adjustment or improperly used. The representative of the gas company adjusted the heater and it was functioning properly when he left the Garcia home. He warned the Garcias of the danger and instructed them how to use the heater. They were advised that it should not be used at night or at any time without open windows. When found several days later it was badly out of adjustment, and burning at full blast at night, with the windows and doors of the house closed except for one very small opening. The testimony of the city gas inspector was that the heater, under the conditions existing in the house, would have remained in adjustment unless someone tampered with the valves.

We think the contention that the gas company is guilty of negligence as a matter of law is answered in McMurdo v. Southern Union Gas Co., 56 N.M. 672, 248 P.2d 668, 670. In that case it was sought to fix liability upon the gas company for furnishing gas to consumers using the unvented open type gas heater without a public warning when it was known that they were dangerous and widely used in Albuquerque. The only difference in the McMurdo case and the case before us is that here the com-

**2.** Graham v. North Carolina Butane Gas Co., 231 N.C. 680, 58 S.E.2d 757, 17 A. L.R.2d 881; Gas Service Co. v. Payton, 8 Cir., 180 F.2d 505; Clare v. Bond County Gas Co., 356 Ill. 241, 190 N.E. 278.

pany knew that the Garcias were using the heater in question and undertook to adjust it after connecting the gas. The evidence is clear that a warning was given and the plaintiff's own evidence shows that the heater was in proper adjustment when the service man left the house. The Garcias were advised how to avoid the dangers created by the use of the heater. In connection with the duty of the gas company the court said in the McMurdo case:

"The evidence discloses that the type of heater used in the J. B. Callahan residence was in common use in the City of Albuquerque and vicinity, and could be purchased at various places within the city. Concededly, it was neither installed nor maintained by appellee. Nevertheless, it is argued that since appellee knew such types of heaters to be dangerous and in common use, it was under a duty to warn the public in some manner or to take steps to avoid dangers necessarily resulting therefrom. Appellant says that it was the duty of the company to refuse or discontinue service upon learning that such type of heater was in common use. The refusal of the court to so instruct the jury is assigned as error. We are not impressed by the argument as the authorities generally hold that a gas company which does not install, own, nor control pipes and appliances in a customer's building is not responsible for the condition in which they are maintained. Scarborough v. Central Arizona Light & Power Co., 58 Ariz. 51, 117 P. 2d 487, 138 A.L.R. 866, and annotation following."

Cf. Cadogan v. Boston Consolidated Gas Co., 290 Mass. 496, 195 N.E. 772.

In order to recover for injuries in New Mexico the evidence must not only show negligence on the part of the defendant, but also that the negligence complained of was the proximate cause of the injuries. McMur-

do v. Southern Union Gas Co., supra; White v. Montoya, 46 N.M. 241, 126 P.2d 471; Greenfield v. Bruskas, 41 N.M. 346, 68 P.2d 921; Gilbert v. New Mexico Construction Co., 39 N.M. 216, 44 P.2d 489. Proximate cause is an ultimate fact and is usually an inference to be drawn by the fact finder from the proven facts. We think it is clear in this case that there is substantial evidence to sustain the finding of the trial court that the negligence of the company, if any, was not the proximate cause of the death of plaintiff's decedent.

Judgment is affirmed.