Robert Livingston **POMEROY**, Executor of the Estate of Elizabeth Eagan Pomeroy, Deceased, Plaintiff,

v.

**PENNSYLVANIA RAILROAD COMPANY**, a corporation, Defendant.

Civ. A. No. 3452–51.

United States District Court
District of Columbia.

July 6, 1955.

See also 223 F.2d 593.

Hyman Smollar, Washington, D. C., for plaintiff.

James C. McKay and Harold M. Willcox, Washington, D. C., for defendant.

PINE, District Judge.

Robert Livingston Pomeroy, executor of the estate of his deceased wife, Elizabeth Eagan Pomeroy, sued the Pennsylvania Railroad Company for damages on account of her death by wrongful act, Section 16–1201 et seq., D.C.Code 1951. After verdict for plaintiff, defendant moved for a judgment notwithstanding the verdict or in the alternative for a new trial, and these are the motions presently before me.

At the trial, plaintiff called three witnesses. Defendant called none, and stood on its motion for a directed verdict. Plaintiff's three witnesses were a draftsman employed by defendant, a former employee of defendant, and the plaintiff. From their testimony and stipulation of

counsel, the facts may be summarized as follows:

After attending a happy family reunion in connection with the birth of a grandchild, Mr. and Mrs. Pomeroy boarded a train operated by defendant at Trenton, New Jersey. Its destination was Washington, D. C., where the Pomeroys resided. They took seats in a coach car in this train. They had planned to have dinner at the Union Station on arrival in Washington. At the time, Mr. and Mrs. Pomeroy were each 69 years of age. Mrs. Pomeroy was in good health, though frail, and in excellent spirits. She was about 5 feet, 3 inches in height. She never did any heavy work, but managed and operated an apartment building owned by her. She had planned to prepare an apartment in this building for occupancy by her son and family when she returned to Washington.

As the train approached Washington, and had begun to slow down, Mrs. Pomeroy told Mr. Pomeroy that she felt warm and was going to get some fresh air. She asked Mr. Pomeroy to get the luggage down, and then went toward the rear of the coach. She was never again seen alive. Her body was found at the base of a railroad signal bridge at the right of the tracks on which the train was operated, and it was stipulated that she departed through the right rear door of the coach, traveling in a southerly direction, and was killed when she struck the ground. The place where her body was found was about two miles from the Union Station in the District of Columbia.

There were no unusual lurches or jerks in the operation of the train, and it was operated in a normal manner. The former employee who testified was a ticket

collector assigned to the coach in which the Pomeroys were riding and two other coaches, one in front of it, and one to the rear of it. After the train left Baltimore, he collected tickets in the three coaches, inspected the doors of the vestibules and found them all closed and in a secure position. As the train passed through Odenton, Maryland, which is about halfway between Baltimore and Washington, he made an inspection and found the doors closed. As the train passed through Seabrook, Maryland, which is about nine miles from the place where Mrs. Pomeroy's body was found, he again inspected the doors and found them closed. About five minutes later,[1] he started to walk through the coaches to announce arrival at the Union Station, and as he reached the rear of the Pomeroy coach, he found both halves of the door swinging loose in an open position.

He closed both halves of the door, and continued on through the coach. It was not unusual for him to find the doors open between stations. The top half of the door is opened by pushing a handle about five feet above the floor of the car, and then pulling the door back with a latch. The bottom half of the door will not open until the top half is first opened. The bottom half is opened by turning a knob, not unlike the knob of an ordinary door. There was a sign in the vestibule, warning passengers to keep off the platform until the train stops. There were no defects in the doors.

According to the draftsman's testimony, there is a curve in the tracks about 2,800 feet long, which ends about 600 feet beyond the point where Mrs. Pomeroy's body was found. It is a one-degree curve, a moderate curve and a safe curve for greater speeds than the limit allowed on it. The curve is banked to the left,

1. This was the ticket collector's approximation, but if the train was traveling at its maximum allowable speed of 80 miles an hour, it would take approximately seven minutes to travel the nine miles between Seabrook and the point where Mrs. Pomeroy's body was found. The ticket collector had walked through the rear coach announcing arrival, and as he reached the vestibule of the Pomeroy (or middle) coach and observed the open doors, he was about a mile beyond the point where Mrs. Pomeroy's body was found. It would therefore appear that something more than five minutes elapsed between the Seabrook inspection and the time he started to announce arrival.

so as to offset the centrifugal force brought into play as a train rounds the curve.

■ Although Mrs. Pomeroy left children surviving her, the only person claiming to have suffered pecuniary loss as a result of Mrs. Pomeroy's death is her husband, Mr. Pomeroy, the plaintiff. The life expectancy of both Mr. and Mrs. Pomeroy at the time of her death was a fraction over nine years. Mrs. Pomeroy owned the apartment building in which she and her husband had an apartment. She provided this dwelling for herself and Mr. Pomeroy, and used the income from the operation of the apartment building, amounting to about $200 a month, and the income from a farm, also owned by her, amounting to about $500 a year, for their joint maintenance. They had no other source of income. She kept house for her husband. After her death, this property was vested in her children.[2]

■ In considering the motion for judgment n. o. v., the Court must construe the evidence most favorably to the plaintiff, and give him the full effect of every legitimate inference therefrom.[3] On this basis, it would appear that Mrs. Pomeroy, feeling warm, entered the vestibule of the coach to get some fresh air; that the doors were open when she entered the vestibule; and that as the train passed around the curve, she was thrown through the open door by the operation of the train, notwithstanding the banking to offset the effect of centrifugal force.[4]

■ But this did not justify submission of the case to the jury under the doctrine of res ipsa loquitur. There was no collision, derailment, defect in machinery, unusual lurch or jerk. The doors were accessible to all passengers and were easily opened. All the elements requisite for the application of the doctrine of res ipsa loquitur, therefore, were not present,[5] and accordingly I found the doctrine inapplicable and refused to submit the case to the jury on that basis with appropriate instructions in use in this jurisdiction.

■■ There was thus left for determination only the question whether there was sufficient evidence of specific negligence for submission to the jury, which I shall now discuss. It is the duty of the railroad, if it provides vestibule cars, to see that they remain closed between stations,[6] and defendant would be negligent if it failed to exercise the highest degree of care to keep them closed at such times. If reasonable men might differ on this point, the case is one for the jury; otherwise it is the Court's duty to direct a verdict for defendant.[7] If the

2. The evidence shows that the children are providing for the support of their father from the income from this property, though not to the same extent as before Mrs. Pomeroy's death. But there may be recovery from a wrongdoer, regardless of anything he may receive from a "collateral source." Hudson v. Lazarus, D.C.Cir., 217 F.2d 344.

3. Gunning v. Cooley, 281 U.S. 90, 94, 50 S.Ct. 231, 74 L.Ed. 720; Shewmaker v. Capital Transit Co., 79 U.S.App.D.C. 102, 143 F.2d 142; Jackson v. Capital Transit Co., 69 App.D.C. 147, 99 F.2d 380, certiorari denied 306 U.S. 630, 59 S.Ct. 464, 83 L.Ed. 1032.

4. It would be unreasonable to infer that she committed suicide, in the light of the foregoing facts, or to infer that she opened both doors for air, as the upper portion of the door would have sufficed for that purpose, and that mechanically had to be opened first.

5. Washington Loan & Trust Co. v. Hickey, 78 U.S.App.D.C. 59, 137 F.2d 677; Norfolk & Western Ry. Co. v. Estepp, 6 Cir., 1953, 204 F.2d 880; Brott v. Texas & Pacific Ry. Co., La.App.1948, 35 So.2d 801.

6. Minneapolis, St. P. & S. S. M. R. Co. v. Galvin, 6 Cir., 1931, 54 F.2d 202, certiorari denied 285 U.S. 551, 52 S.Ct. 407, 76 L.Ed. 941; Carter v. Kurn, 8 Cir., 1942, 127 F.2d 415; Callaway v. Hart, 5 Cir., 1944, 146 F.2d 103, 106, certiorari denied 324 U.S. 866, 65 S.Ct. 915, 89 L. Ed. 1421.

7. Gunning v. Cooley, supra; Shewmaker v. Capital Transit Co., supra; Jackson v. Capital Transit Co., supra.

standard were reasonable care, or the exercise of ordinary prudence and foresight, I would conclude unhesitatingly that reasonable men could not differ that such care had been exercised on the factual basis here involved. But the highest degree of care presents a different and more difficult problem. It contemplates the exercise of all the skill, prudence, and foresight within reason, consistent with the practical operation of the railroad.[8] It is defined by the Court of Appeals, in Tobin v. Pennsylvania R. R. Co., 69 App.D.C. 262, 264, 100 F.2d 435, by quoting with approval Meier v. Pennsylvania R. Co., 64 Pa. 225, as follows:

" 'The utmost care and vigilance is required on the part of the carrier. The rule does not require the utmost degree of care which the human mind is capable of imagining; but it does require that the highest degree of practical care and diligence should be adopted that is consistent with the mode of transportation adopted'."

■ Of course I would not say, under this criterion, that it is the railroad's obligation to post an employee in every vestibule to see that the doors remain closed, but here there were only three inspections between Baltimore and Washington, one at the time of departure from Baltimore, one at Odenton, about halfway between these cities, and one at Seabrook, Maryland, about nine miles from the place where Mrs. Pomeroy's body was found. To be sure, the inspection at Seabrook was only a few minutes before Mrs. Pomeroy departed from the coach, but the ticket collector had only three coaches assigned to his care. His only duty, according to the evidence, was to collect tickets, see to the safety of the passengers and equipment, and announce the arrival of trains at stations. At the time of this incident, the collection of tickets had been completed, and during the critical period here involved he had no duty other than to see to the safety of the passengers and equipment. He knew that it was not unusual to find the doors open between stations, and that the train was approaching its destination, with the inevitable movement and activity of passengers incident to preparation for arrival. Could reasonable men differ as to whether at that time he was sufficiently alert and vigilant to constitute the exercise of the highest degree of care and foresight? Could reasonable men differ as to whether, under these circumstances, with only three coaches to supervise, it was sufficient for him to content himself with the inspection at Seabrook until he announced arrival of the train at Washington? Could a reasonable man, under these circumstances, conclude that he failed to exercise the highest degree of care by not keeping closer scrutiny and check on these three coaches, by looking in on each of them, for example, during this critical period when passengers become restive? In other words, to use a colloquialism, was he sufficiently "on the job" to bespeak the highest degree of care in the minds of all reasonable men? I thought not at the end of the trial, and on further reflection, have not changed my mind. Accordingly the motion for judgment n. o. v. will be denied.

I have considered the motion for a new trial, and find no sufficient basis for granting it.

8. Pistorio v. Washington R. & E. Co., 46 App.D.C. 479, 484; Cole v. Capital Transit Co., 90 U.S.App.D.C. 289, 195 F.2d 568.