The **PENNSYLVANIA RAILROAD COMPANY**, Appellant,

v.

**Robert Livingston POMEROY**, Executor of the Estate of Elizabeth Eagan Pomeroy, Appellee.

No. 12912.

United States Court of Appeals District of Columbia Circuit.

Argued Feb. 24, 1956.

Decided Nov. 15, 1956.

Petition for Rehearing Denied Jan. 2, 1957.

Bazelon, Circuit Judge, dissented.

Mr. James C. McKay, Washington, D. C., with whom Messrs. Hugh B. Cox, James H. McGlothlin and Harold M. Willcox, Washington, D. C., were on the brief, for appellant.

Mr. Hyman Smollar, Washington, D. C., with whom Mrs. Norma G. Zarky, Washington, D. C., was on the brief, for appellee.

Before WILBUR K. MILLER, BAZELON and WASHINGTON, Circuit Judges.

WASHINGTON, Circuit Judge.

This case involves the question of the liability of a railroad for the disappearance and death of a passenger. The appellee Pomeroy (hereinafter referred to as plaintiff) sued in the District Court to recover damages under Section 16–1201 of the District of Columbia Code 1951, alleging that the death of his wife was caused by the negligence of the appellant railroad company. At the conclusion of the plaintiff's evidence, the railroad moved for a directed verdict. This was denied. The railroad then declined to offer any evidence, and stood on its motion. The jury rendered a verdict in plaintiff's favor in the amount of $16,708.50. The railroad moved for judgment notwithstanding the verdict or, alternatively, for a new trial, which motion the trial court denied. The railroad has appealed. The questions before us are whether the evidence was sufficient to permit a reasonable conclusion that the railroad was guilty of specific negligence which proximately caused the death of plaintiff's wife, or, alternatively, whether, under the doctrine of *res ipsa loquitur,* negligence on the part of the railroad may be inferred without specific proof thereof.

The case was here at an earlier stage, when we reversed a judgment of the District Court dismissing the complaint upon plaintiff's opening statement. Pomeroy v. Pennsylvania Railroad, 1955, 96 U.S.App.D.C. 128, 223 F.2d 593. On remand, a jury trial was held. The plaintiff's evidence, together with certain stipulations, disclosed the following:

On September 5, 1950, Mrs. Pomeroy and her husband were coach passengers on one of the railroad's trains en route to Washington. As the train approached its destination, she told her husband that she felt warm and was going to the vestibule to get fresh air. She went toward the rear of the coach and was never again seen alive. Later her body was found to the right of the tracks at Signal Bridge 1338/1339 in the District of Columbia, about 2½ miles from Union Station. The body was lying on the outside edge, and 600 feet from the end, of a "very moderate" (one degree) curve in the tracks totaling 2,800 feet in length.

It was stipulated that Mrs. Pomeroy left the train through the right rear door of the vestibule of the coach in which she had been sitting, and was killed when she struck the ground. No one, however, witnessed her "fall" or the manner in which it occurred, and she of course did not live to give a statement. The evidence rules out the likelihood that she voluntarily jumped from the train.[1]

A ticket collector was in charge of three coaches, including the car on which Mrs. Pomeroy was riding, on the day in question. He testified that his duties were to collect tickets and fares, see to the safety of his passengers, keep his equipment in the best shape possible to his knowledge, and see that passengers were received and discharged properly. As the train left Baltimore, the last stop before Washington, he collected tickets, went through the vestibules of all three cars under his care, and saw no open doors; he inspected his cars again as the train passed through Odenton, Maryland, the halfway point between Baltimore and Washington, and found no open vestibule doors; he again inspected the doors as the train passed through Seabrook, a point approximately 11½ miles from Washington Union Station, and found none open. As he went through some 5 to 9 minutes later[2] to announce

---

1. Mrs. Pomeroy was 69 and was returning home with her husband from a family reunion in New Jersey, in connection with the birth of a child to their son. She was in excellent health and spirits, and was looking forward to readying an apartment (in a building owned by her) for the son and his family, who were

expected to move to Washington shortly. She was perfectly normal, capable, and healthy, though never a strong woman. Thus, the evidence supports the ordinary presumption against suicide.

2. The ticket collector's estimate of the time was about 5 minutes. The trial

the train's arrival at the station he found, at a point about 1 mile past the place where Mrs. Pomeroy's body was later found and 1½ miles from Union Station, both halves of one of the vestibule doors at the right rear of the Pomeroy coach swinging freely. He closed them and continued through his cars. It was not unusual for the collector to find doors open between stations and on the trip in question he had seen the top halves of some doors open. The vestibule doors were halved horizontally. The top half had to be opened first. This was done by turning a latch 5 feet above the floor and swinging the door back against the bulkhead where it was caught with a safety catch. The bottom half was 36 inches high and was opened by turning a knob, very like a door-knob, and swinging the door against the bulkhead where it was designed to be held by a safety catch. After both halves of the door were thus opened and secured, the trap door over the steps leading to the ground could be raised. The trap door was not raised when the collector found the doors swinging freely.

The right rear vestibule doors of the Pomeroy car were not defective, and operated smoothly. They were not hard to open, but it took a "lot of physical strength" to slam them firmly and securely against the bulkhead. There were hand rails for passengers in the vestibule and a warning sign stating that passengers are forbidden to loiter on platforms "any time" the train is in motion. At

the time in question the train was being operated normally, with no unusual lurches or jerks. There is no evidence that the vestibule was not adequately lighted, or that it was wet, slippery or otherwise unsafe for passengers. There was testimony that, in going around a curve, a train tends to produce centrifugal force and to offset this the outer rail on the moderate curve (near the end of which Mrs. Pomeroy's body was found—outside the curve) was raised 3½ inches higher than the inner rail, so that the train banked into the curve.

■ In ruling on the railroad's motion for judgment n. o. v., the trial judge stated that where a railroad provides vestibule cars, it has a duty to see that the vestibule doors remain closed between stations, and that it would be guilty of negligence if it failed to exercise the highest degree of care, consistent with the practical operation of the railroad, to keep them closed at such times.[3] He pointed out that there were only 3 inspections of the vestibule doors between Baltimore and Washington prior to the time the ticket collector went through to announce arrival at Washington station, that the collector knew it was not unusual to find doors open between stations, and that there was inevitable movement and activity of passengers as the train was approaching the station. He concluded that in these circumstances reasonable men could differ as to whether the collector was sufficiently vigilant in checking the doors to comply with the degree of care re-

court thought, however, that the time must have been somewhat greater. There was no direct evidence as to the speed of the train. If, however, it was traveling for the whole 10 miles at a speed of 80 miles an hour (the speed limit on the curve), the elapsed time would have been 7½ minutes. The curve was less than 1 mile in length and the train's speed for the 8 plus miles before reaching the curve may have been greater than 80 miles. It was slowing down at the time Mrs. Pomeroy went to the vestibule, and its average speed for the 10 miles may have been something less than 80 miles per hour. The ticket col-

lector stated that Seabrook is about 9 minutes from Washington (11½ miles away). A range of 5 to 9 minutes would therefore seem to incorporate the outside limits of the elapsed time.

3. We think this is a correct statement of the law. See Carter v. Kurn, 8 Cir., 1942, 127 F.2d 415, 418, and cases cited; St. Louis, I. M. & S. Ry. Co. v. Oliver, 1909, 92 Ark. 432, 433–435, 123 S.W. 662–663; and see Tobin v. Pennsylvania R. Co., 1938, 69 App.D.C. 262, 264–65, 100 F.2d 435, 437–438, certiorari denied, 1939, 306 U.S. 640, 59 S.Ct. 488, 83 L. Ed. 1040.

quired, and thus that it was a question for the jury as to whether there was negligence in this regard.

■ 1. To repeat, the railroad owed its passengers the highest degree of care, consistent with practical operation. The District Court stated that under this criterion it is not the railroad's obligation to post an employee continuously in every vestibule to see that the doors remained closed between stations, and the plaintiff agrees that this is so. There is no suggestion from anyone that the railroad was required, under this standard, to have other employees, in addition to the ticket collector, in the coaches to assist in watching the vestibules. The plaintiff also in effect concedes that the ticket collector was not required to "dash back and forth between coaches" in an effort to inspect vestibule doors more frequently. He does say that, to comply with the standard of highest practical care, the ticket collector here should have made inspections "more often than once in seven or eight minutes" when he "is not otherwise engaged." We agree that the number of inspections that may be required at any time must depend upon the collector's other duties. Practical operation would dictate this. On the issue here, then, whether under the highest care standard more frequent inspections were reasonably needed during the time involved, an essential inquiry is whether the ticket collector had the opportunity, consistent with the performance of his other duties, to make further inspections of vestibule doors in the 5 to 9 minute interval between the inspection at Seabrook and the trip through the coaches to announce the train's approach to Washington station. As the party having the burden of proof, the plaintiff had the obligation, as an element in showing negligence of this sort, to introduce sufficient evidence to permit the conclusion that there was oppor-

tunity for further inspections. Cf. Tobin v. Pennsylvania R. Co., 1938, 69 App.D.C. 262, 263, 100 F.2d 435, 436, certiorari denied, 1939, 306 U.S. 640, 59 S.Ct. 488, 83 L.Ed. 1040.

■ Since the last stop had been at Baltimore, the ticket collector's duty of collecting tickets had been completed before the train reached Seabrook. But the ticket collector had other duties between stops; he was also in charge of equipment and passengers in his three coaches.[4] For the most part, the evidence fails to show how the collector spent the 5 to 9 minute interval involved here. It is of course clear that he spent at least a part of that time in moving through his cars to complete the Seabrook inspection trip and to return to the rear vestibule of the Pomeroy car where he found the open doors. It is possible that, as he passed through, he checked equipment, locked restrooms, stopped to answer questions and assist passengers in various ways, and that such duties consumed the available time, but there is no proof that this was so. On the other hand, it is also possible that the collector's duties on the coaches did not keep him occupied during this interval and that he was idle some of the time, but there is no evidence that this was so. The record simply is silent on this crucial point. The plaintiff, who it must be remembered had the burden of proof, called the ticket collector as a witness but failed to inquire as to his activities in the pertinent interval of time. As a result, the jury was not given any evidentiary basis to infer or conclude that the collector had sufficient time and opportunity, in the short interval involved, to make a further inspection of vestibule doors. In the absence of any evidence supporting or even suggesting the conclusion that the ticket collector was not occupied with his duties in respect of other passengers and other equipment, the District Court erred in

4. The collector described his duties in these words without further elaboration: "Well, you are to lift fares and lift tickets, and see to the safety of your passengers, and keep your equipment in the best shape possible to your knowledge and see that passengers are received and discharged properly."

submitting to the jury the issue of whether the railroad was guilty of negligence in failing to inspect again the rear vestibule doors of the Pomeroy coach. Gunning v. Cooley, 1930, 281 U.S. 90, 94–95, 50 S.Ct. 231, 74 L.Ed. 720; Capital Transit Co. v. Gamble, 1947, 82 U.S.App.D.C. 57, 58, 160 F.2d 283, 284.

In other cases similar to this one—where a passenger has been killed as the result of an unwitnessed and unexplained fall through an unexplained open vestibule door[5]—the holding has universally been that the railroad is entitled to a directed verdict or judgment as a matter of law. For example, in Brott v. Texas & Pac. Ry. Co., La.App.1948, 35 So.2d 801, the railroad was absolved of negligence even though the last inspection of vestibule doors had occurred after the last stop, 10 miles away from the place where the body was found. And see Scott v. New York Cent. R. Co., 1926, 216 App.Div. 623, 216 N.Y.S. 163, where all vestibule doors had been closed after the last stop (which a map shows was considerably more than ten miles back) but there appears to have been no evidence of subsequent inspections, and Cannon v. Louisville & N. R. Co., 1949,

252 Ala. 571, 42 So.2d 340, where the evidence was "silent as to whether the doors were closed or open shortly prior to the time Sanders [the passenger] was killed." 42 So.2d at page 345. Here, the collector inspected the vestibule doors at a point about 9 miles, and about 5 to 9 minutes, before Mrs. Pomeroy fell to her death and again (in connection with announcing arrival at Washington station) about 1 mile after the place where she fell. The elapsed time between these checks could not have exceeded 9 minutes. Certainly it would seem that the standard of care set in the cases just cited, and those cited in footnote 5, was amply met. But it is enough to say that plaintiff has not sustained the burden of offering evidence to support a contrary inference.[6] It must be noted, too, that a mere showing of opportunity to inspect is not sufficient in itself to establish a case for the jury; other considerations enter, as will appear in part two of this opinion.

Apparently recognizing that his proof may be thought inadequate to permit a reasonable inference of negligence, the plaintiff urges that a jury's verdict need not necessarily be based on evidence but that it may rest on speculation and con-

5. See: Cannon v. Louisville & N. R. Co., 1949, 252 Ala. 571, 42 So.2d 340; Brott v. Texas & Pac. Ry. Co., La.App.1948, 35 So.2d 801; Wright v. Central R. Co. of New Jersey, 1940, 124 N.J.L. 113, 11 A. 2d 20; Holland v. Boston & M. R. R., 1932, 279 Mass. 342, 181 N.E. 217; Scott v. New York Cent. R. Co., 1926, 216 App.Div. 623, 216 N.Y.S. 163; Hart v. St. Louis & S. F. R. Co., 1909, 80 Kan. 699, 102 P. 1101. Cf. Norfolk & Western Ry. Co. v. Estepp, 6 Cir., 1953, 204 F.2d 880; Brown v. Union Pac. R. Co., 1910, 81 Kan. 701, 106 P. 1001, 29 L.R.A., N.S., 808; Cole v. Missouri-Kansas-Texas R. Co. of Texas, Tex.Civ.App.1944, 179 S.W.2d 343.

6. The plaintiff cites cases which are distinguishable on their facts. For example, in Carter v. Kurn, 8 Cir., 1942, 127 F.2d 415, there was evidence, if believed, "justifying a finding that the [vestibule] door had been opened by one of the train crew." 127 F.2d at page 419. In Johnston v. St. Louis & S. F.

R. Co., 1910, 150 Mo.App. 304, 130 S.W. 413, there was evidence, if believed, that the vestibule door had been open so long that the railroad should have discovered and closed it, and that the vestibule was so poorly lighted that the open door could not be observed. In Robinson v. Chicago & Alton R. Co., 1903, 135 Mich. 254, 97 N.W. 689, the open door was due to defective fastenings which failed to hold it shut. In Minneapolis, St. P. & S. S. M. Ry. Co. v. Galvin, 6 Cir., 1931, 54 F.2d 202, certiorari denied, 1932, 285 U.S. 551, 52 S.Ct. 407, 76 L.Ed. 941, it was held to be the jury's function to resolve sharp conflicts in the evidence and decide whether the plaintiff fell through an open vestibule door as a result of a sudden lurch, as he testified, or whether, as the railroad's witnesses testified, the door was not open and plaintiff was never inside the coach but fell while clinging to the coach on the outside of the closed vestibule door.

jecture. He relies chiefly on Lavender v. Kurn, 1946, 327 U.S. 645, 66 S.Ct. 740, 742, 90 L.Ed. 916. That was a suit by the administrator of a railroad switchman under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq., where liability is imposed for injuries resulting in "whole or in part" from the employer's negligence. The switchman had been killed at night in the performance of his duties by a blow on the head from a " 'fast moving small round object.' " Although there were no eye witnesses to the blow itself, there was evidence that a mail hook, meeting that description, projected from the side of the train then being switched by the switchman, and that in certain circumstances it could have struck the fatal blow. There was also conflicting "evidence tending to show that it was physically and mathematically impossible for the hook to strike" the switchman, as well as "facts from which it might reasonably be inferred that" the switchman "was murdered." 327 U.S. at page 652, 66 S.Ct. at page 743. In holding that appellate courts are required to abide by the jury's verdict in such circumstances, the Supreme Court pointed out that "the inference that Haney was killed by the hook cannot be said to be unsupported by probative facts" (327 U.S. at page 652, 66 S.Ct. at page 743), and stated on page 653 of 327 U.S., on page 744 of 66 S.Ct.:

"It is no answer to say that the jury's verdict involved speculation and conjecture. *Whenever facts are in dispute or the evidence is such that fair-minded men may draw different inferences,* a measure of speculation and conjecture is required on the part of those whose duty it is to settle the dispute by choosing what seems to them to be the most reasonable inference. *Only when there is a complete absence of probative facts to support the conclusion reached does a reversible error appear.* But where, as here, *there is an evidentiary basis for the jury's verdict,* the jury is free to discard or disbelieve whatever facts are in-

consistent with its conclusion. And the appellate court's function is exhausted when that evidentiary basis becomes apparent, it being immaterial that the court might draw a contrary inference or feel that another conclusion is more reasonable." (Emphasis supplied.)

Thus, the Supreme Court made it abundantly clear that there must be proved facts to support the conclusion reached. See also Myers v. Reading Co., 1947, 331 U.S. 477, 485, 67 S.Ct. 1334, 91 L. Ed. 1615, and the recent Schulz v. Pennsylvania R. Co., 1956, 350 U.S. 523, at page 526, 76 S.Ct. 608, at page 610, where the Court said:

"Jurors are supposed to reach their conclusions on the basis of common sense, common understanding and fair beliefs, *grounded on evidence consisting of direct statements by witnesses or proof of circumstances from which inferences can fairly be drawn.*" (Emphasis added.)

■ The Supreme Court has done much in recent years to effectuate the liberal purposes of the FELA, and has on repeated occasions sustained jury verdicts based on the injury or death of railroad employees resulting "in whole or in part" from the railroad's negligence, including its failure to provide safe working conditions—as in Lavender and Schulz. But the decisions of the Court in this field should not be understood as making a railroad the insurer of its employees. Wilkerson v. McCarthy, 1949, 336 U.S. 53, 69 S.Ct. 413, 93 L.Ed. 497. Much less should they be regarded as making a railroad the insurer of its passengers. Towards them, negligence remains the test, unmodified by FELA or any other special legislation, except perhaps where the plaintiff alleges violation of the safety laws, such as the Safety Appliance Acts, 36 Stat. 298, 45 U.S.C.A. § 1 et seq. Cf. Jacobson v. New York, N. H. & H. R. Co., 1 Cir., 1953, 206 F.2d 156, affirmed 1954, 347 U.S. 909, 74 S.Ct. 474, 98 L.Ed. 1067. No such violation is here alleged. We

do not find that the Supreme Court has cast doubt upon the principle that a passenger or his representative has the burden, if he is to succeed in a suit for negligence against a railroad, of introducing sufficient evidence to warrant the inferences required to support a verdict in his favor.[7] We know of no authority which rejects that principle, or suggests that appellate courts should abdicate their responsibility to see that verdicts are based on adequate evidence. In the circumstances, we cannot relieve the plaintiff—relying on an alleged act of specific negligence—of the burden of making prima facie proof of that act, nor can we hold that a jury is free to make any guess or conjecture it likes, without any evidentiary basis therefor.

■ We do not suggest, of course, that the decisions under the Federal Employers' Liability Act have no helpful application to other types of suits for negligence. What we do say is that those decisions do not lower the threshold of proof to the level claimed by plaintiff-appellee here. Surely if a railroad employee had disappeared from his train under circumstances similar to those of this case, with no further showing of specific negligence, and with no showing of unsafe working conditions or violation of law, there could be no liability on the part of the railroad. Lavender and Schulz cannot be carried that far, and no consideration of public policy would suggest that they should. This is not a case, such as the Lavender case, where the evidence can be said to give some support to several conflicting possible inferences, a situation where the jury's function is apparent. The proof here sheds no light on either possibility: whether the ticket collector was occupied with other duties, or whether he was idle, during a part of the time in question.[8] The plaintiff has thus failed to present facts warranting one of the inferences necessary to establish the act of negligence relied on.

■■ As an alternative theory, the plaintiff suggests that the railroad was guilty of another kind of negligence. He asserts that, because the doors were later found by the ticket collector to be swinging freely, the jury could reasonably infer that they were not fully closed at the time of the Seabrook inspection or that there were defects in the latching mechanisms of both halves which caused them to swing open without any human intervention. But the ticket collector's testimony is that the doors were closed at Seabrook and were not defective in any respect, and there is no evidence to the contrary.[9] The fact that

---

7. In many instances, of course, the plaintiff is entitled to the benefits of the doctrine of *res ipsa loquitur*, a matter to be discussed later.

8. As already pointed out, it is a reasonable inference that a part of the time was spent in moving through his cars to complete one inspection trip and to return to the Pomeroy rear vestibule on the announcement-inspection trip.

9. At the time of the trial the ticket collector was not employed by the railroad. He had left its employ two years before the trial date to operate a gasoline service station, which he still was doing. The trial court ruled that the ticket collector, who was called by plaintiff, was not a hostile witness and that plaintiff's counsel was not surprised by his cross-examination, which amplified but did not conflict with his direct examination. Nevertheless, the plaintiff says that he was not bound by every aspect of the ticket collector's testimony: specifically, the testimony that there were no defects and that the doors were closed at Seabrook. It, of course, is true that a party may not be concluded by the testimony of his own witness in many situations: e. g., where there is conflicting evidence, Alamo v. Del Rosario, 1938, 69 App.D.C. 47, 98 F.2d 328; where the testimony is improbable, Washington Loan & Trust Co. v. Hickey, 1943, 78 U.S.App.D.C. 59, 137 F.2d 677; where the testimony was based on a mere guess. Hilleary v. Earle Restaurant, D. C.1952, 109 F.Supp. 829, 834. But here no circumstances have been shown which would justify disbelief of the ticket collector's testimony in the one respect urged by the plaintiff. It is to be noted that the ticket collector's testimony must be rejected on one point. He said that the doors he found open were in the

the doors were not secured against the bulkhead is not evidence which refutes his testimony since that fact is consequential rather than probative in this context. The swinging doors could be explained by any of various conjectures —e. g., that Mrs. Pomeroy[10] or a third person opened and failed to secure the doors against the bulkhead, or that the latches on the doors were defective, or that the doors were not fully closed when previously inspected. But the fact that the doors were swinging does not indicate or select any one of the possible explanations for that fact as the correct or most probable one, and specifically does not authorize selection of the one possible explanation which the ticket collector's testimony expressly negates.

There is no contention or suggestion that the railroad was guilty of negligence in any other respect. Although the trial court stated [132 F.Supp. 259] that Mrs. Pomeroy "was thrown through the open door by the operation of the train, notwithstanding the banking to offset the effect of centrifugal force" on the curve,[11] it did not suggest that it would be reasonable to find that the railroad operated the train negligently or that it was negligent in not banking the track on the curve to a greater extent. There was no evidence to support a finding of negligence in either respect.

 2. It is axiomatic that, to prevail in a negligence case, a plaintiff must prove sufficient facts, not only to warrant an inference of negligence, but also to justify an inference that such negligence was proximately related to the injury or death. Tennant v. Peoria & P. U. Ry. Co., 1944, 321 U.S. 29, 32, 64 S.Ct. 409, 88 L.Ed. 520; Hernandez v. Southern Union Gas Co., 10 Cir., 1954, 209 F.2d 606, 610. As we stated in Collins v. District of Columbia, 1931, 60 App.D.C. 100, 102, 48 F.2d 1012, 1014:

> "The causal connection between the accident and the negligence of the defendant must not be left to mere conjecture or supposition."

If we assume here, contrary to what we have concluded above, that the plaintiff has offered sufficient evidence to support a conclusion of negligence, the question

---

front vestibule of the Pomeroy coach. This was in conflict with a stipulation previously made by counsel that the open door through which Mrs. Pomeroy left the train was in the rear vestibule. The trial court ruled that the stipulation would govern in this respect, and appellant does not quarrel with the ruling.

10. Since Mrs. Pomeroy went to the vestibule for the purpose of getting fresh air, it seems likely that she would have tried to open the top half of the door, if it was not already open when she got there. She would hardly have attempted to open the bottom half for this purpose, but she may have inadvertently done so by mistake of some kind. She was not a strong woman although "perfectly normal, capable and healthy," and it can be assumed that, if she did unlatch the doors, which the evidence shows was "not hard," it was beyond her physical strength to slam them against the bulkhead sufficiently hard to secure them—an assumption that would explain the fact that the doors were shortly afterwards found to be swinging freely. This of course is conjecture, but it "serves to show the extent to which speculation may run, where

there are no facts by which it is guided or limited." Hart v. St. Louis & S. F. R. Co., 1909, 80 Kan. 699, 102 P. 1101. We noted in the prior appeal of this case, Pomeroy v. Pennsylvania Railroad, 1955, 96 U.S.App.D.C. 128, 129, footnote 1, 223 F.2d 593, 594, footnote 1 that the railroad conceded that it was "highly improbable that the lady's strength would have enabled her to open the door." Such concession is consistent with what we have assumed above—that Mrs. Pomeroy may have unlatched the doors, but could not secure them, an act which took a "lot of physical strength." In any event, the concession was made in connection with the argument of a motion for a directed verdict at the conclusion of the plaintiff's opening statement. The concession was evidently thought required for the purposes of the motion.

11. We do not decide whether this is a reasonable inference, because on the view we take the precise immediate agency which caused Mrs. Pomeroy to go through the open door is irrelevant. The evidence of course is silent as to what that agency was.

remains whether an inference can reasonably be drawn that such negligence was the cause of the fall and resulting death.

There can be no doubt that if the vestibule doors had not been open Mrs. Pomeroy could not have fallen out, and therefore that the open doors were one of the factors that caused or contributed to her fall from the train. But vestibule doors can be freely opened by passengers as well as by railroad employees, and the fact that these doors were open was not *per se* negligence on the railroad's part. The only act of negligence involved here, assuming that there was negligence, was the failure to make further checks of the vestibule doors in the short interval between the Seabrook inspection and Mrs. Pomeroy's fall. To establish the causal relation between this assumed negligence and the death, it must be a reasonable inference from the proof—not a "mere conjecture or supposition"—that such negligence was responsible for the door being open at the time in question. In our view the evidence does not permit such a conclusion.

The vestibule doors in question were closed at Seabrook, 9 miles before the place where Mrs. Pomeroy left the train, and they were obviously open when she fell. We know that they must have been opened by someone, since under the evidence there were no defects which might have caused them to swing open by themselves. The evidence does not indicate who opened the doors in that interval or the length of time they had been open, except that the time could not have exceeded the 5 to 9 minutes it took the train to travel the 9 miles after the Seabrook inspection. The only possibilities are that they were opened by some employee of the railroad other than the collector, or by Mrs. Pomeroy after she entered the vestibule,[12] or by some other passenger on the train. If a railroad employee left the doors open or if another passenger opened the doors sufficiently far in advance of the accident that the railroad should have discovered and closed them, the open doors could properly be attributed to its negligence. But if the doors were opened by another passenger not sufficiently far in advance of the accident to give the ticket collector an opportunity to find and close the doors, the open doors could not reasonably be attributed to any negligence on the part of the railroad. A similar conclusion follows if Mrs. Pomeroy herself opened the doors after reaching the vestibule, since the testimony is uncontradicted that she left for the vestibule shortly before the train was due to arrive in Union Station, and there could therefore have been scarcely any time between her opening the door and falling out in which the ticket collector could have had an opportunity to find the open door. See Williams v. New Jersey-New York Transit Co., 2 Cir., 1940, 113 F.2d 649; Merritt v. Interstate Transit Lines, 8 Cir., 1948, 171 F.2d 605, 609.

The causal connection between the open doors and the assumed negligence thus appears in the case of two of these suppositions but not in the case of the other two. But as previously stated, the evidence does not afford any basis at all to select any one of the four possibilities. Only by an arbitrary guess, not based on or warranted by, any record evidence, could it be inferred that the vestibule doors were opened by a railroad employee or by a passenger under circumstances that would attribute the open doors to the railroad's failure to inspect the vestibule doors in the interval in question. In these circumstances, the jury could not reasonably infer that the doors were open, and that Mrs. Pomeroy's death occurred, as a result of the railroad's assumed negligence.[13] See Brown v. Capi--

---

12. See fn. 10, supra.

13. Not only is there no evidence of any kind, but there are no presumptions in this case to aid a jury in selecting any

one of the possible conjectures. Thus, it is distinguishable from Tennant v. Peoria & P. U. Ry. Co., 1944, 321 U.S. 29, 33–35, 64 S.Ct. 409, 88 L.Ed. 520, where circumstantial evidence, as well

tal Transit Co., 75 U.S.App.D.C. 337, 127 F.2d 329, certiorari denied, 1942, 317 U.S. 632, 63 S.Ct. 61, 87 L.Ed. 510; cf. Reece v. Capital Transit Co., 1956, 97 U.S.App.D.C. 274, 230 F.2d 824.

3. The doctrine of *res ipsa loquitur* does not require a result opposed to the conclusions recited above. When this case was previously before us, we indicated that consideration of the applicability of the doctrine of *res ipsa loquitur* was to await presentation of the plaintiff's evidence. Pomeroy v. Pennsylvania Railroad, 1955, 96 U.S.App.D.C. 128, 223 F.2d 593. After the plaintiff's case was in, the District Court ruled that the doctrine did not apply to the facts proved by plaintiff. We agree with the District Court.

■■■ In general, the rule is that, where an injury occurs which in the ordinary course of things would not have occurred if the one having control had used proper care, a reasonable basis is afforded, in the absence of any explanation, to attribute the injury to the lack of care on the part of the defendant. See Jesionowski v. Boston & Maine R. Co., 1947, 329 U.S. 452, 456, 67 S.Ct. 401, 91 L.Ed. 416. We have said that negligence may be inferred without additional proof thereof, when (1) the cause of an accident is known, (2) the cause was in the defendant's control or right of control, and (3) the cause was unlikely to do harm unless the defendant was negligent. Washington Loan & Trust Co. v. Hickey, 1943, 78 U.S.App.D.C. 59, 61, 137 F.2d 677, 679. Examination of the facts discloses that some of these elements are not present in this case.

The open vestibule doors were unquestionably a contributing or partial cause of Mrs. Pomeroy's fall. To that extent—and to that extent only—the cause of Mrs. Pomeroy's death is known. The District Court went further, and inferred that centrifugal force was the means immediately causing her fall. But even that, assuming *arguendo* that the inference is correct, is not enough. The vestibule doors were accessible to all passengers and could be freely opened by anyone, for reasons of both safety and convenience, so that the necessary element of control over the opening of the doors is lacking.[14] See Norfolk & Western Ry. Co. v. Estepp, 6 Cir., 1953, 204 F.2d 880, 882. To be sure, an open vestibule door on a moving train is a potentially dangerous thing, but the fact that it was open does not in and of itself presuppose negligence. As has already been shown, in the absence of proof, various equally plausible conjectures, other than the railroad's negligence, would account for the open doors. Since the doors may have been open for reasons other than a failure of duty on the railroad's part, it cannot be said that the accident would not in the ordinary course have occurred if the railroad had not been negligent.

■■■ In the absence of proof of the necessary elements to bring the doctrine of *res ipsa loquitur* into play, the jury could not properly infer negligence on the part of the railroad, without specific proof thereof, from the mere fact that Mrs. Pomeroy fell through an open vestibule door of a moving train. See Norfolk & Western R. Co. v. Estepp, supra; Brott v. Texas & Pac. Ry. Co., La.App. 1948, 35 So.2d 801; Brown v. Union Pac. R. Co., 1910, 81 Kan. 701, 106 P. 1001, 29 L.R.A.,N.S., 808.

Reversed and remanded with directions to enter judgment for the defendant.

---

as certain presumptions, supported the inference which the jury drew.

14. Maintenance of the doors was of course under the exclusive control of the railroad, but here there was no evidence of a defective condition in the door which caused the accident. Thus, this case is distinguishable from Safeway Stores v. West, 86 U.S.App.D.C. 99, 180 F.2d 25, certiorari denied, 1950, 339 U.S. 952, 70 S.Ct. 840, 94 L.Ed. 1365, where the accident was caused by a broken coil spring in the door.

BAZELON, Circuit Judge (dissenting).

The jury decided for the appellee because it found that the appellant had negligently failed to make an adequate number of inspections of the vestibule doors and that, as a result of such negligence, decedent had fallen to her death through an open door. My colleagues hold that there was no evidence from which the jury could have found (1) that appellant's ticket collector had any opportunity to make any additional inspections, or (2) that, even if there had been such opportunity, the failure to inspect was proximately related to the accident.

Whether there was opportunity for additional inspection and, thus, whether appellant was negligent depends upon what other duties the ticket collector had during the five to nine minute period in question. The collector testified that his duties were "to lift fares and lift tickets and see to the safety of [the] passengers, and keep [the] equipment in the best shape possible to [his] knowledge, and see that passengers are received and discharged properly." The evidence was, further, that the collection of fares and tickets and the receipt of passengers had already been completed prior to the time here in question and that the discharge of passengers would not occur until arrival at Union Station. Hence, the only duties to be executed by the collector in the crucial period were those which the jury apparently found he had negligently failed to execute, namely, to keep the equipment in the best possible condition (e. g., the doors closed) and see to the safety of his passengers (e. g., prevent the decedent from falling off the train). I think the jury could fairly have inferred, as apparently it did, from the collector's testimony as to what his duties were, that he had an idle period during which he could have made another inspection of the doors. If some undescribed other duty had to be or was performed during that interval, the appellant should have introduced some evidence of it.

I cannot agree with the majority that, merely because inferences in conflict with the jury's inferences are possible, the jury should not be allowed to decide the facts. "It is not the function of a court to search the record for conflicting circumstantial evidence in order to take the case away from the jury on a theory that the proof gives equal support to inconsistent and uncertain inferences." Tennant v. Peoria & P. U. R. Co., 1944, 321 U.S. 29, 35, 64 S.Ct. 409, 412. I would follow Schulz v. Pennsylvania R. Co., 1956, 350 U.S. 523, 76 S.Ct. 608, and Lavender v. Kurn, 1946, 327 U.S. 645, 66 S.Ct. 740.

In Schulz, a tugboat fireman whose duty called for him to work on four tugboats moored side by side, stepping from one to another, was found drowned in the harbor. There was no evidence as to how he fell into the water, but there was evidence that he was a capable and experienced workman, that three of the tugs were unlighted and the fourth partially lighted, and that there was some ice on the tugs. 350 U.S. at pages 524–525, 76 S.Ct. at page 609. The trial court directed a verdict in favor of the defendant. The Court of Appeals for the Second Circuit, reasoning as do my colleagues in the instant case, affirmed, saying:

"The evidence of such alleged negligence was slight, and perhaps at most only doubtfully sufficient to present a jury question as to defendant's breach of duty. But beyond this, there was no showing whatsoever that the alleged conditions were causally related to the accident. Plaintiff never contended that the ice completely covered the barges or that the pier or the barges were entirely shrouded in darkness. We have no way of knowing how or where the accident occurred, and cannot say that it was proximately caused by any default on the part of the defendant." 1955, 222 F.2d 540, 541.

The Supreme Court reversed because the evidence was sufficient to require sub-

mission of the case to the jury. The Court said:

"But the courts below took this case from the jury because of a possibility that Schulz might have fallen on a particular spot where there happened to be no ice, or that he might have fallen from the one boat that was partially illuminated by shore lights. Doubtless the jury could have so found (had the court allowed it to perform its function) but it would not have been compelled to draw such inferences." 350 U.S. at page 526, 76 S.Ct. at page 610.

In Lavender v. Kurn, a railroad switch-tender was found dead in the switchyard with a wound in his head. The plaintiff's theory was that the blow came from a negligently maintained mail hook hanging on the outside of a passing mail car. The evidence indicated that the hook *"might* pivot" and its end *"could* thus be swung out to a point 3 to 3½ feet from the rail and about 73 inches above the top of the rail." 327 U.S. at page 649, 66 S.Ct. at page 742.[1] Decedent was too short to be struck by the end of the hook unless he was on an elevation of some kind. There was such an elevation—an "uneven" mound of cinders *some* parts of which were high enough. Ibid. There was no evidence that decedent had in fact been standing on the mound. But, *"If he had been standing on the mound about a foot from the side of the mail car he could have been hit* by the end of the mail hook \* \* \*. His wound was \* \* \* *well within the possible range* of the mail hook end." Ibid. The defendant's theory was a simpler one—that decedent had been murdered by a blow with a pipe. There were facts in the record "from which it might reasonably be inferred" that the murder theory was correct. Id., 327 U.S. at page 652, 66 S. Ct. at page 744. Indeed, there was even "evidence tending to show" that plain-

tiff's theory was "physically and mathematically impossible." Ibid. The jury's verdict for the plaintiff was upset by the Missouri Supreme Court on the ground that, although decedent " 'could have been struck by the mail hook knob *if*[2] he were standing on the south side of the mound and the mail hook extended out as far as 12 or 14 inches \* \* \* all reasonable minds would agree that it would be mere speculation and conjecture to say that [he] *was* struck by the mail hook' and that 'plaintiff failed to make a submissible case on that question.' " Id., 327 U.S. at page 651, 66 S.Ct. at page 743.

Like the Supreme Court of Missouri in Lavender, the majority here holds that the jury's verdict was based not on rational inferences, but on speculation and conjecture. The evidence, in its view, as easily supports an inference that there was not an opportunity to inspect the doors again as that there was, and an inference that the accident was not caused by the failure to inspect the doors again as that it was. I think what the Supreme Court of the United States said in reversing the Supreme Court of Missouri in Lavender applies equally well to the majority view here:

"It is no answer to say that the jury's verdict involved speculation and conjecture. Whenever facts are in dispute or the evidence is such that fair-minded men may draw different inferences, a measure of speculation and conjecture is required on the part of those whose duty it is to settle the dispute by choosing what seems to them to be the most reasonable inference. Only when there is a complete absence of probative facts to support the conclusion reached does a reversible error appear. But where, as here, there is an evidentiary basis for the jury's verdict, the jury is free to discard or disbelieve whatever facts are inconsistent with its conclusion. And

---

1. Emphasis here and hereinafter supplied, unless otherwise indicated.

2. Emphasis in original.

the appellate court's function is exhausted when that evidentiary basis becomes apparent, it being immaterial that the court might draw a contrary inference or feel that another conclusion is more reasonable." Id., 327 U.S. at page 653, 66 S.Ct. at page 744.[3]

If the evidence in Lavender v. Kurn satisfied the Supreme Court that a jury could infer that the injury resulted from the defendant's action or inaction, I do not see how the evidence here can fail to satisfy us. Indeed, in my judgment, this is a stronger case than Lavender v. Kurn. If the jury could reasonably infer, as from the evidence here it clearly could, that the appellee was negligent in not checking the doors more frequently, I think it is a highly probable inference that proper care would have avoided the accident. I concede the physical possibility that some stranger could have followed appellee's agent about and opened the door right after it had been checked. In the circumstances, I think the judgment of comparative probability was well left to the jury.

That Lavender and Schulz arose under the Federal Employers' Liability Act, 45 U.S.C.A. § 51, is not a reason, so far as I am concerned, for limiting in any way the effect of those decisions in non-F.E.L.A. cases.[4] The line of cases of which Lavender and Schulz are representative reversed a trend toward appellate domination of juries which had deprived "jury trial in current civil cases * * * [of] most of its significance." Green, Jury Trial and Mr. Justice Black, 65 Yale L. J. 482 (1956). I would not restrict this salutary development to F.E.L.A. cases. The suggestion that it should be so restricted because "under that act, the jury's power to draw infer-

ences is greater than in common-law actions,"[5] has been criticized as unjustified and merely reflecting "how far the courts have gone in other areas of litigation in restricting, if not denying, the jury's orthodox common-law function to draw inferences." Id. at 490, n. 17. The language of the Court in Lavender and Schulz which I quote in this opinion is not related to the "in whole or in part" provision of the statute. Nor do I find in those cases anything else that makes them inapplicable to cases like the instant one which arise under the common law. I do find that the appellate interference with juries which the Supreme Court condemned in the F.E.L.A. cases was based upon the same ground as the majority's decision in the instant case. Id. at 489.

---

3. See also Schulz v. Pennsylvania R. Co., 350 U.S. at pages 525–526, 76 S.Ct. 608.

4. I see no reason to distinguish between a case where a passenger mysteriously falls from a train and one where an employee mysteriously falls from a barge. If the threshold of proof is low enough to be reached by the unexplained cir-

cumstances of the one case, it seems to me it is also reached in the other.

5. Cahill v. New York, N. H. & H. R. R., 2 Cir., 1955, 224 F.2d 637, 640 (dissent), reversed 1955, 350 U.S. 898, 76 S.Ct. 180, amended 1956, 351 U.S. 183, 76 S.Ct. 758.