ADMIRAL TOWING COMPANY, a corporation and Walter B. Martinson, Appellants,

v.

Theo WOOLEN and Dorothy E. Cone, Appellees.

No. 16735.

United States Court of Appeals Ninth Circuit.

April 18, 1961.

Hamley, Circuit Judge, dissented in part.

Lofton L. Tatum, Wood, Matthiessen, Wood & Tatum, Portland, Or., for appellants.

Ewing Sibbett, Gladstein, Andersen, Leonard & Sibbett, San Francisco, Cal., Frank Pozzi, Pozzi & Wilson, William F. White, White, Sutherland & White, Portland, Or., for appellees.

Before STEPHENS and HAMLEY, Circuit Judges, and BOWEN, District Judge.

STEPHENS, Circuit Judge.

Pursuant to 46 U.S.C.A. § 185, Admiral Towing Company, a corporation, and Walter B. Martinson, an individual, petitioned the District Court for a limitation of liability arising out of the disappearance at sea of the tug boat Companion en route from San Francisco to Astoria, Oregon. The court denied the petition. It ruled that Martinson was the de facto, equitable and true owner of the tug although legal title resided in Admiral Towing Company, that Martinson with privity and knowledge had negligently failed to provide the vessel with an adequate crew, a life boat or life raft, or a functioning ship-to-shore radio, and that these omissions rendered the Companion unseaworthy and proximately caused her loss at sea and the deaths of her master, John R. Cone, and her sole crewman, Paul Woolen, who were aboard her.

On appeal, both Admiral Towing Company and Martinson contend that the evidence was insufficient to show negligence or unseaworthiness or to show that such alleged negligence or unseaworthiness proximately caused the loss of the tug or the deaths of Cone or Woolen. In addition, appellant Martinson contends that the District Court lacked jurisdiction to hear his petition to limit liability because he was neither the owner nor the charterer of the vessel. He also argues that if the court had jurisdiction, it erred in concluding upon the evidence that he had

privity or knowledge of the inadequacy of the Companion's crew. Appellees are Cone's widow and the administratrix of Woolen's estate.

In September, 1956, Martinson sold the Companion and another tug, the Bulldog, to Louis B. Horne and an associate. Part of the purchase price of both vessels was paid in cash; the balance was represented by two promissory notes given to Martinson by Horne. One of these notes was secured by a mortgage upon the Companion. Horne sailed the Companion from Portland, Oregon, the scene of the sale, to San Francisco, where for some time it plied the waters of the bay. In March, 1957, Horne transferred legal title to Admiral Towing Company, a corporation of which he was president. Several months later, when the promissory notes given in payment of the purchase price of both the Companion and the Bulldog were in default, Martinson and Horne, on behalf of himself (Horne) and Admiral Towing Company, entered into a written agreement providing that Horne would deliver the vessels to Martinson at Astoria, leaving San Francisco within sixteen days of the date of agreement, weather permitting. Upon delivery of the tugs to him, Martinson was to cancel Horne's promissory notes. If Horne did not depart from San Francisco within the time alloted, Martinson reserved the right to cancel the agreement and take other action.

Horne attempted once to fulfill his end of the bargain but the Bulldog sank in the vicinity of Bolinas Bay, and the Companion was brought back to San Francisco. He then advised Martinson that he would be unable to deliver the Companion to Astoria, at least until his funds were replenished. Consequently, in July, 1957, Martinson employed Cone at Portland to bring the Companion north from San Francisco. Cone was to receive $425.00 for the job. He was advanced that sum, supplied with instructions pertinent to his task, and given a letter from Martinson to Horne and Admiral Towing Company reading in full as follows:

"This letter is to authorize John R. Cone to act as my representative and agent in the matter of returning the Companion from San Francisco to Portland, Oregon."

When Cone arrived in San Francisco and showed this letter to Horne, the latter turned the Companion over to him. No other written or oral agreement was thereafter made among the parties. Martinson apparently paid for whatever Cone thought was needed either to ready the Companion for the trip or to sustain her at sea. And during the course of the vessel's preparation Cone was frequently in contact with Martinson through the latter's San Francisco attorney. The Companion was last seen by anyone involved in this litigation moored in San Francisco on the night of July 18, 1957.

Unbeknownst to Martinson, Cone had taken Woolen with him from Portland to act as a deckhand on the intended voyage of the Companion from San Francisco to Astoria. Woolen was seventeen years of age and without experience in deep sea ship operations. Martinson well knew that Cone was going to take on a crewman, but the selection of the man was left entirely to Cone as the vessel's master. Martinson did not know that Cone had hired Woolen until the loss of the Companion had been reported.

### Ownership

Under 46 U.S.C.A. §§ 183, 186, only an owner or charterer of a vessel may petition to limit liability arising from its loss.[1] Martinson originally sought in his complaint to place himself within the purview of the statute; in this appeal he claims just the opposite.

We think he is estopped from following such a course. In Callanan Road Improvement Co. v. United States, 1953, 345 U.S. 507, 73 S.Ct. 803, 97 L.Ed. 1206, the appellant, by instituting proceedings before the Interstate Commerce Commission, had obtained the transfer to itself of a certificate of convenience and necessity. It then unsuccessfully attempted to win an interpretation of the certificate so that it could engage in towing services. Still perservering, it brought suit alleging that the Commission lacked the power to issue the certificate as it existed at the time the appellant had successfully obtained this transfer. The Supreme Court was unimpressed. It declared that: " * * * the appellant, having invoked the power of the Commission to approve the transfer of the amended certificate to it, is now estopped to deny the Commission's power to issue the certificate in its present form and as it existed prior to the time the appellant sought its transfer. * * * The appellant cannot blow hot and cold and take now a position contrary to that taken in the proceedings it invoked to obtain the Commission's approval. If the appellant then had taken the position it seeks now, the Commission might conceivably have refused its approval of the transfer." 345 U.S. at page 513, 73 S.Ct. at page 806. The same reasoning is applicable here. Had Martinson obtained a favorable judgment below limiting his liability as an owner or charterer of the Companion, he would have been more than satisfied. But now that the District Court has determined that he had knowledge of or was privy to the negligence or unseaworthiness which caused the loss of the Companion, he seeks to repudiate the

---

1. Section 183(a) provides as follows:

"The liability of the owner of any vessel, whether American or foreign, for any embezzlement, loss, or destruction by any person of any property, goods, or merchandise shipped or put on board of such vessel, or for any loss, damage, or injury by collision, or for any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, without the privity or knowledge of such owner or owners, shall not, * * * exceed the amount or value of the interest of such owner in such vessel, and her freight then pending."

Section 186 provides:

"The charterer of any vessel, in case he shall man, victual, and navigate such vessel at his own expense, or by his own procurement, shall be deemed the owner of such vessel within the meaning of the provisions of this chapter relating to the limitation of the liability of the owners of vessels."

position he took at the outset, namely, that he was entitled to seek the benefits of the limitation statute. Indeed, as in the Callanan Road Improvement Co. case, if Martinson had assumed the position in the District Court which he now urges before us, the judgment from which he appeals could never have been issued; his petition for limitation would never have been filed.

Martinson's contention that he was neither the owner nor the charterer of the Companion at the time she disappeared may also be disposed of upon other grounds. The Supreme Court has frequently declared that the terms of the Limitation Act should be given a broad construction so as to achieve Congress' purpose: to induce and encourage investment in shipping. Flink v. Paladini, 1929, 279 U.S. 59, 49 S.Ct. 255, 73 L.Ed. 613; American Car & Foundry Co. v. Brassert, 1933, 289 U.S. 261, 263, 53 S. Ct. 618, 77 L.Ed. 1162. In recent cases the term "owner" has accordingly been given a liberal definition, one that coincides with popular notions of the meaning of ownership. In Petition of Colonial Trust Co., D.C.D.Conn.1954, 124 F.Supp. 73, the court ruled that the holder of a lifetime interest in a pleasure craft and the trust company which as trustee held legal title to the vessel were both "owners" within the meaning of § 183. The holder of the life estate not only had equitable title but, significantly, exercised a substantial number of the attributes of ownership. She had full and exclusive possession and control of the craft, and she was responsible for its maintenance and operation. Her dominion over the vessel was such as to qualify her, said the court, as an owner under the statute. Similarly, in Petition of United States, 3 Cir., 1958, 259 F.2d 608, Mathiasen's Tanker Industries, Inc., sought to limit its liability for the loss of a vessel owned by the United States but operated by Mathiasen under a written contract. The contract granted Mathiasen exclusive possession and management of the vessel. The court concluded that

Mathiasen was thus both a charterer and an owner *pro hac vice.*

We are well aware of the significant differences between the present case and the two mentioned above. Here Martinson, through his agent Cone, exercised complete control and dominion over the Companion, but he held no life estate in the lost vessel nor was he operating her under a written contract which approximated a chartering agreement. Nevertheless, these decisions exemplify the desirably broad definition which courts have come to place upon the term "owner."

In American Car & Foundry Co. v. Brassert, supra, the Supreme Court indicated that a mortgagee not in possession was not an owner within the meaning of the statute. And Petition of Colonial Trust Co., supra, and The Severance, 4 Cir., 1945, 152 F.2d 916, certiorari denied sub nom.; Stone v. Diamond Steamship Transportation Corp., 1946, 328 U.S. 853, 66 S.Ct. 1344, 90 L.Ed. 1626, make it clear that possession and control standing alone are insufficient to confer ownership. When, however, a mortgagee such as Martinson comes into possession and control of a vessel as the first step in a process which is to culminate uninterruptedly in his becoming the holder of legal title to her, we think he becomes an owner for purposes of limiting his liability. This for the reason that his relationship to the vessel is such as might reasonably afford grounds upon which a claim of liability for damages might be asserted against him, a claim predicated on his status as the person perhaps ultimately responsible for the vessel's maintenance and operation and a claim against which the Limitation Act is designed to furnish protection. See Petition of United States, supra; Petition of Colonial Trust Co., supra; Austerberry v. United States, 6 Cir., 1948, 169 F.2d 583; The Milwaukee, D.C.E.D. Wis. 1931, 48 F.2d 842. For all intents and purposes, when the Companion was given over to Cone by Horne in San Francisco, ownership of the vessel passed

to Martinson despite the fact that technical legal title had not yet passed. Consequently, even if he were not estopped on the issue, Martinson would be an "owner" within the meaning of § 183. The District Court's exercise of jurisdiction is sustained.

### Liability

■ The standard of conduct which the law imposes upon shipowners consists primarily of the obligation to provide a seaworthy vessel.[2] One facet of this obligation is the duty to supply an adequate and competent crew. Boudoin v. Lykes Bros. S. S. Co., 1955, 348 U.S. 336, 75 S.Ct. 382, 99 L.Ed. 354; Petition of United States, 2 Cir., 1949, 178 F.2d 243, 252; Spellman v. American Barge Line Co., 3 Cir., 1949, 176 F.2d 716, 721; The Rolph, 9 Cir., 1924, 299 F. 52, 54, certiorari denied sub nom; Rolph Navigation & Coal Co. v. Kohilas, 1924, 266 U.S. 614, 45 S.Ct. 96, 69 L.Ed. 468. If, then, the Companion was manned by an inadequate crew, Martinson's duty as shipowner was breached, and he would be liable for damages to appellees on either the theory of negligence or that of unseaworthiness. The question of whether or not the crew was inadequate is one of fact, and we cannot disturb the trial court's ruling on that issue un-

less we find it to be so clearly erroneous that a material mistake has been made.[3] McAllister v. United States, 1954, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20; Pacific Tow Boat Co. v. States Marine Corp., 9 Cir., 1960, 276 F.2d 745, 752, or, put another way, unless the evidence clearly preponderates in the opposite direction. Furness, Withy & Co. v. Carter, 9 Cir., 1960, 281 F.2d 264.

■ The evidence showed that the Companion was a two-man vessel and that Woolen was a seventeen year old high school student with no experience upon the open sea. The journey which the Companion was to make was one of over fifty hours duration. Although Martinson testified that a crew composed of Captain Cone and an inexperienced boy of high school age was a common and safe practice under the circumstances, appellee Woolen's expert witness, Jahn, testified that a vessel such as the Companion making the trip which it attempted to make would be improperly manned with only Cone and a person of Woolen's inexperience and youth aboard as crewman. From this conflicting evidence the trial court by believing Jahn, as it apparently did, could well have concluded, as it actually did, that the Companion was inadequately manned.

2. For a general review of the meaning of unseaworthiness, see Gilmore & Black, Admiralty §§ 3–27, 6–38 et seq. (1957).

3. The "clearly erroneous" rule derives from Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A. viz., "In all actions tried upon the facts without a jury * * * findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses. * * *" The classic definition of a "clearly erroneous" finding was delivered by Mr. Justice Reed in United States v. United States Gypsum Co., 1948, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 as follows: "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been

committed." This rule has been frequently and consistently applied in the Ninth Circuit (as well as in all other circuits) to bind conclusively the Court of Appeals as to all district court findings of fact unless such findings are clearly erroneous. See, for example, O. H. Kruse Grain & Milling v. C. I. R., 9 Cir., 1960, 279 F.2d 123, 126; Hoppe v. Rittenhouse, 9 Cir., 1960, 279 F.2d 3, 9; Axelbank v. Rony, 9 Cir., 1960, 277 F.2d 314, 317; Bloom v. United States, 9 Cir., 1959, 272 F.2d 215, 223; Ng Yip Yee v. Barber, 9 Cir., 1959, 267 F.2d 206, 209; Elrick Rim Co. v. Reading Tire Mach. Co., 9 Cir., 1959, 264 F.2d 481, 486, certiorari denied, 1959, 360 U.S. 920, 79 S.Ct. 1434, 3 L.Ed.2d 1535; Nelson v. New Hampshire Fire Ins. Co., 9 Cir., 1959, 263 F.2d 586, 588; Albina Engine & Mach. Works, Inc. v. American Mail Line, Ltd., 9 Cir., 1959, 263 F.2d 311, 314; Joseph v. Donover Co., 9 Cir., 1959, 261 F.2d 812, 817, 824.

### Privity or Knowledge

Assuming the validity of the District Court's finding that the Companion lacked an adequate crew, and that therefore she was negligently rendered unseaworthy for the intended cruise, Martinson contends that such inadequacy was something of which he was ignorant and to which he was not privy; and if he was without privity in or knowledge of the causative negligence or unseaworthiness, the District Court should not have barred him from limiting liability under § 183.[4] Martinson relies upon Coryell v. Phipps, 1943, 317 U.S. 406, 63 S.Ct. 291, 87 L.Ed. 363, and The Trillora II, D.C.E.D.S.C. 1947, 76 F.Supp. 50.

In Coryell v. Phipps a leak in the machinery of the pleasure yacht Seminole permitted gasoline fumes to gather in her engine room causing a fire which destroyed other vessels lying nearby. The Supreme Court assumed arguendo that an individual rather than a corporation was the owner of the yacht. This owner had employed competent personnel to inspect the vessel prior to the fire, yet the inspection had failed to uncover the perilous leak. The owner himself had no knowledge or suspicion of the defect, and the Court ruled that the negligence of those whom he had hired to inspect his vessel could not be attributed to him. To impute such negligence, said the Court, would render the requirement of privity or knowledge meaningless.

The Trillora II was a yacht owned by Solomon Guggenheim. It had been taken out of the water during World War II. After the war while in the process of being overhauled and recommissioned, the vessel exploded, causing damage to shore installations. Rothschild, one of Guggenheim's business managers, had been entrusted with, among other things, the whole business of maintaining the yacht. Guggenheim apparently did not wish to involve himself personally with the chores and problems of keeping and running his vessel. The actual work of recommissioning was delegated to Captain Gott, the yacht's master, and his negligence in cranking an auxiliary engine had seemingly caused the explosion. The court held that the alleged negligence of Captain Gott could not be attributed to either Rothschild or Guggenheim, for to impute to a shipowner the negligence of the vessel's master would pervert the meaning and purpose of the Limitation Act. Such a position would discourage investment in seagoing vessels.

■ Coryell v. Phipps and The Trillora II make it clear that an individual owner of a vessel may immunize himself against the charge of privity or knowledge by delegating shoreside as well as seagoing duties to subordinate personnel. Accordingly, Martinson claims that any negligence in hiring an inadequate crew or any knowledge of the unseaworthiness created by such inadequacy was the negligence or knowledge of Cone, that he, Martinson, had no personal knowledge of or privity with the employment of an inexperienced deckhand, and that Cone's negligence or knowledge cannot be imputed to him.

In response to this argument, appellees claim that the authority granted by Martinson to Cone was so broad, general and unlimited that Cone's knowledge or negligence was in the eyes of the law the knowledge or negligence of Martinson. In re Great Lakes Transit Corp., 6 Cir., 1936, 81 F.2d 441, 444; In re New York Dock Co., 2 Cir., 1932, 61 F.2d 777, 779. In these two cases, said the Supreme Court, indicating neither approval nor disapproval, it was "thought that the scope of authority delegated by an individual owner to a subordinate may be so broad as to justify imputing privity * * * as well as knowledge." Coryell v. Phipps, supra, 317 U.S. at page 411, 63 S.Ct. at page 294. The failure of Coryell v. Phipps to disavow the view-

---

4. The statute requires the absence of privity or knowledge as a prerequisite to limitation. See note 1, supra. Appellees apparently concede that the loss of life amendments to the Limitation Act, 46 U.S.C.A. § 183(e) do not apply in the Companion's case. See 46 U.S.C.A. § 183(f).

point expressed in In re Great Lakes Transit Corp., supra, and In re New York Dock Co., supra, encouraged the court in The Trillora II to adopt it. "[W]here an [individual] owner expressly delegates full authority to act for and in his behalf to an agent," said the court, "he is bound by the acts of the agent and will be held in privity by the knowledge of the agent." 76 F.Supp. at page 52. If Rothschild had had privity or knowledge as to Gott's negligence, such privity and knowledge would have been attributable to Guggenheim. Ibid.

We think the notion that the negligence or knowledge of an agent endowed with a broad, unlimited authority is that of his shipowner-principal for purposes of the Limitation Act is too encompassing and all-inclusive. "Privity, like knowledge, turns on the facts of particular cases." Coryell v. Phipps, supra, 317 U.S. at page 411, 63 S.Ct. at page 294. There will surely come a case where the unlimited agent is the master of the vessel and the causative negligence is an error in seamanship resulting from a spur of the moment decision. To impute the master's mistake to the shipowner in such a situation simply because the master has been given broad and unlimited agency powers over the operation and maintenance of the vessel, would be to rob the shipowner of just that protection which the Limitation Act was apparently designed to afford him: immunization from instantaneous negligence on the part of the master at sea, negligent behavior over which the shipowner could not possibly exercise control. See La Bourgogne, 1908, 210 U.S. 95, 123, 28 S.Ct. 664, 52 L.Ed. 973; Gilmore & Black, Admiralty, § 10–22 (1957). That the master had unlimited agency powers to take care of all other aspects of keeping and running the vessel would seemingly be irrelevant. Moreover, it strikes us as unreasonable to allow an individual shipowner to limit liability if he splits up the tasks involved in maintaining and operating a vessel among several agents whose functions are restricted, yet deny him limitation if he selects one man to manage and oversee the whole operation. We prefer to rest our decision in the instant case upon more narrow grounds.

■ In Spencer Kellogg & Sons, Inc. v. Hicks, 1932, 285 U.S. 502, 52 S.Ct. 450, 76 L.Ed. 903, the Supreme Court held that a man by the name of Stover was sufficiently high in the hierarchy of the corporate shipowner so that his negligence could be attributed to the corporation,[5] and that he was negligent when, with knowledge both that the company's ferry should not be run when ice was on the river and that the ice had begun to form, he did no more than instruct the ferry's master not to run through the ice. Instructions were deemed not enough. In the instant case, Martinson was put on notice that Cone may well have hired a deckhand in Portland of whom Martinson would not approve, for despite Martinson's inquiries as to the identity of the deckhand employed Cone refused to reveal his name. Indeed, Cone later changed his story and told Martinson that he had not hired anybody in Portland, that he would hire somebody in San Francisco. Upon such a state of facts, it seems to us that Martinson, like Stover in Spencer Kellogg, had a duty to do something more than instruct Cone to employ a competent crewman. Admittedly, Stover knew for sure that it was dangerous to run the ferry in ice-filled waters, while Martinson could only suspect that Cone had hired an inadequate crew member. Even so, Martinson, who admitted that he knew just about every man available for the job, was on notice of a possible inadequacy. He could have been assured that the Companion had a competent crew by merely finding out the identity of the

5. The knowledge or privity of a corporate owner must always be imputed. When a corporate owner is involved the significant question is how high in the ranks of the corporation was the individual who had the privity or knowledge. See 3 Benedict, Admiralty § 490 (6th ed. 1940); Gilmore & Black, Admiralty § 10–24 (1957).

deckhand selected. Yet despite having the means of knowledge so close at hand, Martinson failed to act. Considering the limited scope of the task of bringing the Companion north from San Francisco, see Gilmore & Black, supra, at p. 704, the ease with which Martinson could have checked on the identity of Cone's deckhand, and the fact that Martinson knew that Cone might well have hired an inadequate man in Portland, we think that Martinson must be deemed privy both to the negligence of Cone in sailing with an incompetent crew and to the resulting unseaworthiness of the Companion.[6]

### Cause

As we have noted, the evidence is sufficient to support the District Court's conclusions that the Companion sailed from San Francisco manned by an inadequate crew, and that this inadequacy and the consequent condition of unseaworthiness were the result of negligence to which Martinson was privy and of which he had knowledge. Since nothing has been heard from, of, or about the vessel or her crew since she set out from San Francisco in July, 1957, no direct evidence of the cause of her disappearance appears in the record. However, in wrongful death actions sounding in negligence under the Jones Act, 46 U.S.C.A. § 688, the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq. (adopted by reference and made part of the Jones Act), and the Death on the High Seas Act, 46 U.S.C.A. § 761, or sounding in unseaworthiness under general maritime law, when the exact circumstances of the casualty are unknown, the United States Supreme Court has fundamentally transformed traditional negligence law respecting causation by permitting the finder of fact to supply by *inference* many of the elements normally required to be proven by the plaintiff or claimant.

Thus, an accident may be inferred from the fact of disappearance; and the "where" and "when" of the accident need not be fixed exactly. Schulz v. Pennsylvania R. Co., 1956, 350 U.S. 523, 76 S.Ct. 608, 100 L.Ed. 668; Roth v. Bird, 5 Cir., 1956, 239 F.2d 257; Lavender v. Kurn, 1946, 327 U.S. 645, 66 S.Ct. 740, 90 L.Ed. 916; Butler v. Whiteman, 1958, 356 U.S. 271, 78 S.Ct. 734, 2 L.Ed.2d 754, reversing Harris v. Whiteman, 5 Cir., 1957, 243 F.2d 563; McDonough v. Buckeye S. S. Co., D.C.N.D.Ohio 1951, 103 F.Supp. 473, affirmed 6 Cir.1952, 200 F.2d 558, certiorari denied 1953, 345 U.S. 926, 73 S.Ct. 785, 97 L.Ed. 1357; Stinson v. Atlantic Coast Line R. Co., 1957, 355 U.S. 62, 78 S.Ct. 136, 2 L.Ed.2d 93, reversing 264 Ala. 522, 88 So.2d 189 and 266 Ala. 244, 96 So.2d 305; and Gaymon v. Quinn Menhaden Fisheries of Texas, Inc., Fla.App. 1960, 118 So.2d 42.

As to "how" or "why" the accident occurred, considerable "speculation" is permitted.[7] The trier of fact must be af-

---

6. Appellees suggest that the duty to employ a competent crew is non-delegable, that Martinson must be held responsible whether or not he had privity or knowledge of the hiring of Woolen. The non-delegable nature of the duty to provide a competent crew has been stated recurrently in cases involving corporations or the government as owners. Petition of United States, 2 Cir., 1949, 178 F.2d 243, 252; The Rolph, supra, 299 F. at page 55; The Drill Boat No. 4, D.C.D.Mass. 1916, 233 F. 589, 594; Gilmore & Black, Admiralty, at p. 702 n. 96. As noted by Gilmore & Black, id. at 702, non-delegability also attaches to the duty to provide a seaworthy ship, seaworthiness being used in its "primitive sense," but embracing at least the obligation to provide a vessel without physical defects. It seems to us, however, that if the duty to provide a physically safe ship—as well as to appoint a competent crew—is non-delegable, the individual owner would seldom be entitled to limitation, possibly only when active negligence on the part of a competent master or crew at sea is involved. The insulation afforded an individual owner by the Limitation Act would for the most part be stripped away. We here mean neither to reaffirm nor to disparage the principle of non-delegability insofar as corporate owners are concerned, but we choose not to apply it in the present situation.

7. "It is no answer to say that the jury's verdict involved speculation and conjec-

forded substantial latitude in making this determination even though the evidence supporting it is slight and even though the reviewing court might have arrived at a different conclusion. Schulz v. Pennsylvania R. Co., supra; Sadler v. Pennsylvania R. Co., 4 Cir., 1947, 159 F.2d 784; Johnson v. United States, 1948, 333 U.S. 46, 68 S.Ct. 391, 92 L.Ed. 468; Conner v. Butler, 1959, 361 U.S. 29, 80 S.Ct. 21, 4 L.Ed.2d 10, reversing Fla.App.1959, 109 So.2d 183.

As to the defendant's negligence constituting the legal cause of the accident, "slight evidence" is sufficient so long as the inference is that which reasonablé, prudent men might reach on the basis of the evidence. By use of an extension of the "res ipsa loquitur" principle regarding "permissible inferences from unexplained events," the finder of facts may *infer* the requisite legal causation. Schulz v. Pennsylvania R. Co., supra; Roth v. Bird, supra; see Sadler v. Pennsylvania R. Co., supra; Lavender v. Kurn, supra; Butler v. Whiteman, supra; McDonough v. Buckeye S. S. Co., supra; Stinson v. Atlantic Coast Line R. Co., supra; and Conner v. Butler, supra.

The test is simply "whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury * * *. It does not matter that, from the evidence, the [finder of fact] may also with reason, on grounds of probability, attribute the result to other causes, including the employee's contributory negligence." Rogers v. Missouri Pacific R. Co., 1957, 352 U.S. 500, 506,

77 S.Ct. 443, 448, 1 L.Ed.2d 493, quoted in Gaymon v. Quinn Menhaden Fisheries of Texas, Inc., supra, 118 So.2d at page 45, the latter possessing many points of similarity with the instant case.[8]

In Jones Act and admiralty litigation Roth and Schulz are the landmark cases with respect to causation.

In Roth v. Bird, 5 Cir., 1956, 239 F.2d 257, the M/V Wingate was a yacht converted to carry cargo. Under the direction of its captain, it was loaded with a cargo of raw coffee in Mantanzas, Cuba. The cargo filled the hold and dining room, and 19% of it was stored on deck. The vessel sailed for New Orleans, Louisiana, December 22, 1949, and disappeared at sea. The entire crew was lost. None of their bodies, save only the captain's, was recovered. The action was brought to recover for the deaths of three of the seamen.

The District Court excluded the testimony of plaintiffs' expert witness, Richard Irving, and directed a verdict for the defendants for plaintiffs' failure to prove their allegations under the Jones Act that the ship had been negligently overloaded and that said overloading was the legal cause of the loss.

The Fifth Circuit held that Irving's testimony should have been permitted. In his proffer Irving testified that the Wingate was dangerously loaded and unstable so that there was "a possibility of the vessel foundering." 239 F.2d at page 261.

There was no other testimony in the trial which would indicate causal connection between the Wingate's unseaworthi-

---

ture. Whenever facts are in dispute or the evidence is such that fair-minded men may draw different inferences, a measure of speculation and conjecture is required * * * by choosing what seems to * * * be the most reasonable inference." Lavender v. Kurn, supra, 327 U.S. at page 653, 66 S.Ct. at page 744. The court in McDonough v. Buckeye S. S. Co., supra, 103 F.Supp. at page 477, in quoting the above passage, commented: "Modern decisions display great liberality in the construction of the Jones Act and the

Federal Employers' Liability Act * * * in respect of proof of negligence and causation."

**8.** The Gaymon court, 118 So.2d at page 46, in reversing a judgment for the defendant because "the employer's negligence *may* have played some part in producing the death complaint of * * *," stated that a jury question is established simply by showing "some negligence on the part of the employer coupled by direct or circumstantial evidence to the injury or death of an employee." (Emphasis added).

ness arising from overloading and the subsequent foundering of the vessel and the deaths of all hands aboard.

The court concluded that the jury could have found that the plaintiffs' decedents lost their lives as the proximate result of negligent overloading and consequent unseaworthiness of the Wingate. This judgment was based on no more evidence than would justify the jury in finding overloading and consequent unseaworthiness plus Irving's expert opinion that the loading was "dangerous" under the circumstances plus the fact of disappearance of the vessel. There was no evidence directly connecting the overloading with the foundering; in fact, no evidence was introduced as to any of the facts of the ship's disappearance; only the disappearance itself was established.

As in the instant case, the court's conclusion on the question of legal cause might be described as "conjectural". Here, too, the casualty might have resulted from causes having nothing to do with the overloading, such as an explosion, negligent steering onto rocks or shoals, or an abnormal swell. However, there the court relied, as we do here, on the permissible inference, akin to *res ipsa loquitur*, that the requisite legal cause may be found from evidence of negligence and/or unseaworthiness on the one hand and disappearance of the vessel on the other.

In Schulz v. Pennsylvania R. Co., 1956, 350 U.S. 523, 76 S.Ct. 608, 100 L.Ed. 668, plaintiff's decedent was a tugboat fireman who was assigned to watch four tugs tied up at a Jersey City, New Jersey, pier on Christmas night, 1949. He reported for work in the early evening, started on his duties, and was never again seen alive. His body was found a week later in the river near an adjacent

pier. A flashlight was clutched in his hand.

His widow sued under the Jones Act for negligent failure of defendant to provide him with a safe place to work. The District Court directed a verdict for defendant, stating, "There is some evidence of negligence, and there is an accidental death. But there is not a shred of evidence connecting the two."

The Court of Appeals affirmed, saying that while the evidence was "perhaps at most only doubtfully sufficient to present a jury question as to defendant's breach of duty," it failed to show "how or where the accident occurred" or "that it was proximately caused by any default on the part of the defendant." 2 Cir., 1955, 222 F.2d 540, 541.

The Supreme Court, reversing, held that the jury could have found that the tugs were insufficiently lighted, that there was some ice on the tugs, that a shortage of manpower required the decedent to handle four tugs by himself, and that he had to step from one boat to another with only a flashlight to provide illumination.

In spite of eloquent and insistent statements by the trial and appellate courts that the requisite legal cause was lacking because decedent might have fallen on a particular spot where there was no ice or which was partially illuminated by shore lights (in short, because the actual circumstances of the accident were unknown), nevertheless the Court held that the jury could find both negligence and legal causation.

The ratio decidendi of the Court's decision was not concerned with whether the decedent was engaged in the performance of his duties when he met his death,[9] nor the concession that his de-

---

9. When the facts are not available the claimant is aided by the presumption that the decedent was engaged in his duties when he met his death, Silvestri v. New York, Chicago & St. Louis Railroad Co., D.C.W.D.Pa.1959, 180 F.Supp. 491, affirmed 3 Cir., 1960, 274 F.2d 666, and that he exercised due care for his own

safety. Tennant v. Peoria & Pekin Union Ry. Co., 1944, 321 U.S. 29, 34, 64 S.Ct. 409, 88 L.Ed. 520; Sweeting v. Pennsylvania R. Co., 3 Cir., 1944, 142 F.2d 611; United States v. Fotopulos, 9 Cir., 1950, 180 F.2d 631. "This presumption * * * rises to the dignity of evidence * * * because of death, the plaintiff can-

mise was not due to alcohol, foul play or suicide;[10] it dwelt on the right of the finder of fact to draw the inference that the defendant's negligence was the legal cause of the death of one of its employees working under dangerous conditions when no facts of the "how," "why," "when" or "where" of the accident were available.

The inference of legal cause was not compelled but was permissible on the basis of "common sense, common understanding and fair beliefs, grounded on evidence consisting of direct statements by witnesses or proof of circumstances from which inferences can fairly be drawn." 350 U.S. at page 526, 76 S.Ct. at page 610. The Court thus extended its rule of "permissible inferences from unexplained events." Johnson v. United States, supra. It marked the further development, in this type of case, of the Court's special brand of *res ipsa loquitur*.[11]

■■■■■ For the reasons and because of the authorities heretofore cited the requirement of legal cause can be supplied by inference when, as here, there is negligence and/or unseaworthiness on the one hand and an unexplained disappearance of a vessel at sea on the other.

In light of our expressed conclusions, the judgment of the District Court is af-firmed. We therefore need not review the other findings of negligence, i. e., the lack of a ship-to-shore radio and the absence of a life boat or a life raft, which appellants claim, are unsupported by the evidence.

Affirmed.

HAMLEY, Circuit Judge (dissenting in part).

If appellants are liable to Woolen and Cone it is on the ground of negligence or unseaworthiness. They owed Woolen the duty not to employ him as a crewman because of his inexperience. They breached that duty by reason of Cone's act in employing Woolen, and Martinson's failure to discover and cancel Cone's act. The vessel was not seaworthy because of Woolen's incompetence. Hence, both on the grounds of negligence and unseaworthiness appellants are liable to Woolen.

In my view, however, the situation is entirely different as to Cone. I do not believe appellants owed the experienced Cone any duty of discovering and canceling his own act of negligence in employing Woolen. If this is true, then liability as to Cone cannot be predicated on negligence, because the sole negligence as to Cone would be his own. It would then also follow that appellants are not

---

not testify * * *. It is sufficient to support the * * * finding of a court unless overcome by irrefutable evidence." United States v. Fotopulos, supra, 180 F. 2d at page 637.

10. Again, in the absence of known facts the plaintiff is aided by presumptions against suicide, foul play and intoxication. See Sadler v. Pennsylvania Railroad Co., 4 Cir., 1947, 159 F.2d 784, 786; Pennsylvania Railroad Co. v. Pomeroy, 1957, 99 U.S.App.D.C. 272, 239 F.2d 435, 438 note 1; and McDonough v. Buckeye S. S. Co., D.C.N.D.Ohio 1951, 103 F.Supp. 473, 477.

11. See Gilmore & Black, Admiralty, 311 (1957). It should be noted that, while the *res ipsa* presumption is customarily employed to charge the defendant with negligence, the special kind of *res ipsa* developed by the Court is here used to supply the element of legal cause. As the Court stated in Johnson v. United States, supra, 333 U.S. at page 49, 68 S.Ct. at page 393, "No act need be explicable only in terms of negligence for the rule of *res ipsa loquitur* to be invoked. The rule deals only with permissible inferences from unexplained events." Gilmore & Black, supra, at p. 312, commenting on Johnson v. United States, supra, state, "* * * plaintiff makes his prima facie case by showing that he was injured and that the injury *could have* been caused by the negligence of the shipowner * * * that is enough to justify the trial judge in giving plaintiff a verdict; in a case tried to a jury, the jury would be allowed to draw whatever 'permissible inferences' occurred to it. Apparently the only way in which defendant can win a directed verdict is to establish by indisputable and uncontroverted evidence both the cause of the accident and its own freedom from negligence."

chargeable to Cone on the ground of unseaworthiness, for as to him the unseaworthiness was brought about solely by Cone's negligence.

In Boudoin v. Lykes Bros. S. S. Co., 1955, 348 U.S. 336, 75 S.Ct. 382, 384, 99 L.Ed. 354, a seaman was permitted to recover on the theory of unseaworthiness when he was assaulted and injured by a fellow seaman who was found to be "a person of dangerous propensities and proclivities." But if the seaman whose propensities and proclivities rendered the ship unseaworthy was himself injured in the brawl, I do not think he could have recovered. As noted in the Boudoin case, liability by reason of unseaworthiness is based upon a breach of a warranty of seaworthiness. I would hold that the warranty does not extend to one who by reason of his own sole willful or negligent conduct produced the condition relied upon as establishing unseaworthiness.