Beverly NYGAARD, as Administratrix of the Estate of Michael Clyde Sullivan, deceased, Plaintiff,

v.

PETER PAN SEAFOODS, INC., Defendant.

No. C79–1083B.

United States District Court, W. D. Washington.

Jan. 21, 1981.

Arnold J. Barer and John S. York, Jr. of Weckworth, Barer & Meyer, Seattle, Wash., for plaintiff.

Michael H. Williamson and George H. Luhrs of Madden, Poliak, MacDougall & Williamson, Seattle, Wash., for defendant.

BEEKS, Senior District Judge.

Michael Clyde Sullivan was lost overboard from the crab fishing vessel SEVEN SEAS on December 17, 1977, at a point approximately twenty miles west-northwest of Amak Island in the Bering Sea near the Alaska Peninsula. Beverly Nygaard commenced this action as personal representative on behalf of the estate and beneficiaries of the decedent and seeks relief under the Jones Act[1] and the general maritime law. Trial on the issue of liability was had before this court on December 22, 1980.

The SEVEN SEAS, owned by defendant, was originally constructed as a purse seiner and used in the California coastal sardine fishery. Subsequently, she was converted for use as a crab fishing vessel in Alaskan waters. At the time of Sullivan's death, she was relatively old and not safely operable in winds over 25–30 knots and thus was used primarily for operations close to shore. She is of 129 gross tons, 78½ feet in length, 22½ feet in breadth, 9½ feet in depth, and of wooden construction. Her crew at the time in question consisted of Gary Hudwin (skipper), Mike Moretro and Dave Rodriguez (deckhands), and decedent (engineer). Also on board was decedent's son, Mike Sullivan, Jr.[2]

Crab fishing entails use of cage-like containers called "crab pots." These pots are baited and sunk in an area to be retrieved at a later time. SEVEN SEAS could carry approximately 45 crab pots, each measuring 6½' × 6½' × 32". They were stowed on her afterdeck up to twelve feet high and lashed into place. When all the pots were stowed, only one small 10' × 15' area remained open on the deck. This "work area" was located on the starboard side abaft the house. It was bounded forward by the after bulkhead of the house, through which there was a door, on the starboard side by a low bulwark,[3] and on the port side and after end by the crab pots. A davit used to launch and retrieve the pots was located along the bulwark in the work area.[4] The pot launcher was located on the starboard side immediately aft of the work area. It consisted of a frame ramp sloped from the deck to the top of the starboard bulwark, and from it the pots were raised and lowered by use of the davit. Two pots were stowed on the pot launcher at the time decedent was lost.

Running from the work area forward on the starboard side of the main deck was a three foot walkway. It was bordered by the starboard bulwark and rail and the starboard bulkhead of the house. A second door into the house was located on this bulkhead and it led into the berthing compartment near the engine room.

The vessel left the dock at False Pass, Alaska on the morning of December 17, 1977, the end of crab fishing season, and proceeded north into the Bering Sea to retrieve crab pots. Throughout the day the crew pulled in and stowed 45 pots, and by 2255 hours the retrieval was complete and the vessel was preparing to return south. At that time Dave Rodriguez was on top of the stacked pots lashing and securing them, and Mike Moretro was standing in the work area. Both men saw decedent enter the house through the door from the work area and followed him soon thereafter.

Inside the house, decedent's son, who was lying on the bunk, talked momentarily with his father. Decedent was going to the engine room to remove the "power take-off." This would allow the vessel to speed up. Without its removal, the vessel could only achieve a speed of two nautical miles per hour. A moment later he heard his father's voice call out what he thought to be his name, "Mike."

At about 2305 hours the skipper, wondering why the power take-off had not yet

---

1. 46 U.S.C. § 688.

2. Mike Sullivan, Jr., was 16 years of age and not considered part of the crew. He was quite seasick during the entire voyage.

3. The bulwark is part of the ship's hull which rises above deck.

4. The davit is a small crane or derrick which can project over the side of the vessel. It was used primarily to hoist crab pots.

been removed, discovered that decedent was missing. The vessel and the surrounding waters were searched to no avail. The search was terminated about 0400 hours, December 18.

■ To establish liability, plaintiff must demonstrate that Sullivan's death was caused either by defendant's negligence or by an unseaworthy condition of SEVEN SEAS.[5] The following conditions are alleged to have existed on the vessel at the time decedent was lost:

1. Garbage bags were left blocking the walkway on deck.

2. The work area was cluttered with unstowed gear and rope.

3. The decking in the work area was slippery due to (a) leaking hydraulic fluid; and (b) the absence of a nonskid deck covering.

4. The crew was not provided with proper life-saving vests.

5. The starboard bulwark in the work area was dangerously low and not topped with a railing of safe height.

6. The davit along the starboard bulwark in the work area would swing loose because of an unreliable locking device in the davit stand and it had to be lashed down to prevent such swinging.

■ Although plaintiff has failed to establish the existence of the conditions alleged in numbers 1–4 above, I find that the conditions alleged in numbers 5 and 6 have been proved. Furthermore, the low bulwark, the absence of any rail, and the unreliable davit lock made the vessel unsafe and unseaworthy under the sea and weather conditions expected in the Bering Sea in December.[6] At the time decedent was lost the sea was rough with an approximately 4–6 foot ground swell and a 2–4 foot wind swell. While such conditions are moderate for that season in the Bering Sea, the vessel undoubtedly pitched and rolled considerably.

A bulwark only 32″ high and a loose swinging davit in the work area created a patently dangerous situation. The bulwark and rail on other parts of the vessel were as high as four feet and it would have been not only feasible but consistent with the use of the vessel to have raised the bulwark in the work area. Such a low bulwark, in the absence of any rail, offered little or no protection to one engaged in securing and locking the davit with the vessel rolling and pitching. The lock on the davit stand not only allowed the davit and attached crab block to swing freely at times, but the extra lashings necessary to secure it had to be checked continually as the movement of the vessel could loosen them. Furthermore, the lashing created an additional obstacle over which one could trip while on deck.

■ Plaintiff's burden of demonstrating that one or more of these unseaworthy conditions proximately caused Sullivan's death is difficult. No person witnessed the loss and little evidence exists as to its cause. In *Admiral Towing Company v. Woolen*,[7] the Court of Appeals, to which I am accountable, stated that in a wrongful death action for negligence or unseaworthiness, where the facts and circumstances of the casualty are unknown, that the fact-finder can supply by inference the elements establishing causation. Citing considerable authority, the court stated:

*Oil Co.*, 210 F.2d 233, 1954 A.M.C. 573 (2d Cir. 1954). The vessel must be fit for the use anticipated, and must be able to withstand expected seasonable weather in the area where used. *Artemis Maritime Co. v. Southwestern Sugar & Mol. Co.*, 189 F.2d 488 (4th Cir. 1951).

**5.** The test of liability under the Jones Act is whether defendant's negligence played any part, even the slightest, in decedent's death. *See Ferguson v. Moore-McCormack Lines*, 352 U.S. 521, 77 S.Ct. 457, 1 L.Ed.2d 511 (1957); *Spinks v. Chevron Oil Co.*, 507 F.2d 216 (5th Cir. 1975). The term seaworthy is a relative one. A seaworthy vessel, generally, is one sufficiently strong, staunch, and appropriately equipped to allow it to safely engage in its intended use. *See Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941, 1960 A.M.C. 1503 (1960); *Ondato v. Standard*

**6.** 9 United States Coast Pilot 240 (7th ed. 1964) ("Late fall and early winter is the time of almost continuous storminess.")

**7.** 290 F.2d 641 (9th Cir. 1961).

[A]n accident may be inferred from the fact of disappearance; and the "where" and "when" of the accident need not be fixed exactly. . . .

As to "how" and "why" the accident occurred, considerable speculation is permitted. The trier of fact must be afforded this substantial latitude in making this determination even though the evidence supporting it is slight. . . . [8]

Perhaps decedent was attempting to secure the loose davit at the time he was lost. His son heard him call the name "Mike." He may have been calling to Mike Moretro for help in lashing the davit down or lifting the lock into place. The lock had two handles and required both hands to lift into position. It may very well be that decedent had to stand on the bulwark to get proper leverage in lifting the lock. This I do not know, and on this point there is no conclusive evidence. Nevertheless, on the evidence presented, I can, and do, make the reasonable inference that the unseaworthy condition aforesaid was a proximate cause of Sullivan's death.

Plaintiff is thus entitled to recover. I find, however, that this recovery must be reduced by a percentage equalling decedent's own negligence contributing to his loss. A rule existed on the vessel that no crewmember should go alone on deck in circumstances as they existed at the time in question. Although this rule was not strictly enforced, decedent was an experienced seaman and engineer and was well aware of the perils incident to his activities. He knew of the loose davit and low bulwark, but he nonetheless ventured out alone on deck late at night. I find decedent's act of working on deck alone, in known dangerous conditions, was negligent and a factor of 50% in the cause of his death.

Accordingly, plaintiff is entitled to a recovery for the loss of decedent, and such damages, yet to be established, shall be reduced by an amount commensurate with the findings herein. Counsel for the parties are directed to appear for a conference before this court on January 29, 1981, at 11:00 a. m., for the purpose of setting a date on which to hear the issue of damages.

This memorandum of decision shall constitute the court's findings of fact and conclusions of law on the issue of liability pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

---

[8]. 290 F.2d at 649, 650. *Admiral Towing* was a case dealing with the disappearance of a tugboat in unknown circumstances. Its reasoning is persuasive and applicable to the case at hand. *See also In re New England Fish Co.*, 465 F.Supp. 1003 (W.D.Wash.1979).