968 F.2d 1215
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
LECO CORPORATION, d/b/a Pier 33 Marina, Petitioner-Appellant,
v.
Kathy A. GRAMS, Gordon C. Grams, David F. Lorentz,
Claimants-Appellees.
 No. 91-1860.
 United States Court of Appeals, Sixth Circuit.
 July 7, 1992.
 
 Before RALPH B. GUY, Jr. and DAVID A. NELSON, Circuit Judges, and REAVLEY, Senior Circuit Judge.*
 PER CURIAM.
 
 
 1
 Under 46 U.S.C. § 183, a boat owner's liability for injury caused by collision may be limited to the value of the owner's interest in the vessel. The question presented in this appeal is whether a boat dealer that had accepted as a trade-in a motorboat that was subsequently involved in a collision should be treated as an "owner" of the trade-in even though legal title had not yet passed to the dealer. The district court held that the dealer was not an "owner," and on that basis entered summary judgment rejecting the dealer's petition for limitation of liability. We disagree with the court's resolution of the ownership question, and we shall therefore reverse the judgment and remand the case for further proceedings.
 
 
 2
 * The boat dealer, LECO Corporation, owns a marina in St. Joseph, Michigan. In the spring of 1990 a salesman for the marina, one Brad Fritch, telephoned a prospective customer named Peter Koransky to ask if Koransky wanted to buy a new Bayliner Avanti watercraft. (Mr. Koransky had previously expressed an interest in this boat.) Koransky said he did want to buy the vessel, and he went to the marina on April 14, 1990, to talk price.
 
 
 3
 Mr. Koransky owned an earlier model Bayliner, the "All Time High," which he contemplated using as a trade-in. Koransky gave salesman Fritch an oral description of the "All Time High," and Fritch wrote out a draft purchase agreement that specified a trade-in value of $25,000. Mr. Fritch then discussed the deal with the general manager of the marina, James Geerlings, and Mr. Geerlings calculated that the trade-in would have an "actual cash value" of $17,000. This figure was substituted for the $25,000 figure on the purchase agreement and on a "Trade Data" sheet. (Mr. Geerling's initials appear next to the $17,000 figure on the trade data sheet.)
 
 
 4
 Mr. Koransky was offered two options; he could trade in his old boat and pay an additional $35,000 (subsequently reduced to $33,000) plus tax, title and registration, or he could buy the new Avanti without a trade-in for $51,500 plus tax, title and registration. Mr. Koransky said he would take the first option.
 
 
 5
 Koransky was anxious to complete the deal that day, and he asked salesman Fritch to follow him to South Haven, Michigan to inspect the trade-in at the facility where it was dry docked. Fritch did so, and after looking the vessel over he told Koransky that "we have a deal." Mr. Koransky signed the purchase agreement and made a $3,000 deposit. Two "Bills of Sale" were typed up by the business manager, but they were subsequently voided.
 
 
 6
 After arranging to have the boat placed in the water, Mr. Koransky dropped off the boat's ignition keys at the marina. A couple of days later a bank agreed to provide Mr. Koransky financing, and the deal was set to close in the near future.
 
 
 7
 Under the marina's policy, all trade-in boats had to be inspected by the sales and service managers for "final adjustments." The marina wanted to make sure that things such as seat cushions and fire extinguishers were all in place, and it wanted to see that the boat was operating properly. The cost of rectifying any problems disclosed in the "final adjustments" inspection would be charged to the person trading the boat in. To facilitate this procedure, a trade-in was required to be brought into the marina at least two days before delivery of the boat that was to replace it.
 
 
 8
 Salesman Fritch planned to go to South Haven to pick up the "All Time High" for final inspection on April 24, 1990. Several other employees of the marina, including claimants Kathy Grams and David Lorentz, were going to a bar in South Haven to celebrate the sales manager's birthday, and they invited Fritch to ride with them in Lorentz' cigarette boat.
 
 
 9
 The group eventually dropped Fritch off at the dry dock facility so he could retrieve the "All Time High." By this time, as Fritch admitted in his deposition testimony, he had consumed several beers. In the course of moving the boat to the marina, Mr. Fritch collided with the cigarette boat. Mrs. Grams and Mr. Lorentz were injured, and the "All Time High" was wrecked.
 
 
 10
 Four days later, on April 28th, Mr. Koransky returned to the marina to accept delivery of his new boat. He signed a bill of sale, gave the marina a signed certificate of title for the "All Time High," and took possession of the new Avanti. No one told him that the "All Time High" had been in a collision, and he was given credit for the full $17,000 agreed on before the accident.
 
 
 11
 The Grams and Mr. Lorentz subsequently brought personal injury actions against LECO in a Michigan state court. LECO then filed a petition in the United States District Court for the Western District of Michigan seeking, among other things, a limitation of liability under 46 U.S.C. §§ 183 et seq. ("the Limitation Act"). The proceedings in state court were stayed pending resolution of this case.
 
 
 12
 On cross-motions for summary judgment the district court concluded that LECO did not qualify as an "owner" and thus was not entitled to a limitation of liability. The entry of summary judgment on this basis made it unnecessary for the district court to decide if there was any other reason why LECO could not obtain an adjudication that its liability was limited. LECO has appealed the judgment against it.
 
 II
 
 13
 When loss or damage occurs "without the privity or knowledge" of a vessel owner, the Limitation Act provides that the owner's liability is limited to the value of the owner's interest in the vessel (after the accident) and the vessel's pending freight. 46 U.S.C. § 183(a). To obtain the protection afforded by the Limitation Act, the owner must file a petition and post security for the value of its interest. 46 U.S.C. § 185. Thereafter the district court will enjoin all other actions and require all persons who have claims against the owner to assert them in the district court. In re Complaint of Midland Enterprise, Inc., 886 F.2d 812, 813 (6th Cir.1989).
 
 
 14
 Under the statute, these protections are available only to one who qualifies as an "owner." This term is not defined in the Limitation Act, and the Supreme Court has indicated that it is an "untechnical" word that should be given a broad construction to achieve Congress' purpose of encouraging investment in American shipping. Flink v. Paladini, 279 U.S. 59, 62-63 (1929); see also Coryell v. Phipps, 317 U.S. 406, 411 (1943).
 
 
 15
 Although the parties focus on the question whether title to the boat had passed under Michigan law, the Supreme Court has made it clear that legal title is not determinative of ownership under the statute. American Car & Foundry Co. v. Brassert, 289 U.S. 261 (1933). Most courts have settled on the notion that an owner, for purposes of the Limitation Act, is one who has the type of relationship to the vessel that could subject the person to liability as a shipowner. See Dick v. United States, 671 F.2d 724, 727 (2d Cir.1982) ("As a general rule, one who is subjected to a shipowner's liability because of his exercise of his dominion over a vessel should be able to limit his liability to that of an owner") (citations omitted); Admiral Towing Co. v. Woolen, 290 F.2d 641, 645 (9th Cir.1961); In re: Exoneration from Liability of Shell Oil Co., 780 F.Supp. 1086, 1089 (E.D.La.1991); The Milwaukee, 48 F.2d 842 (E.D.Wis.1931).
 
 
 16
 LECO argues that it was an owner of the "All Time High" at the time of the accident because it had bound itself to accept the boat as a trade-in and had assumed dominion and control over it prior to the accident. We find this argument persuasive.
 
 
 17
 Although legal title had not passed, there was a binding agreement on the part of the marina to accept the boat as a trade-in. Mr. Geerlings had approved acceptance of the boat at a value of $17,000, and Brad Fritch, after inspecting the vessel, had told Mr. Koransky that "we have a deal." Mr. Koransky had agreed to the trade-in, and he testified that he thought the deal was complete except for some "final adjustments" that would occur after the boat was inspected by the sales and service managers.
 
 
 18
 The Grams and Mr. Lorentz contend that there was no agreement to accept the boat as a trade-in because the sales and service managers still needed to inspect the vessel. But the purpose of the inspection was to determine whether any final adjustments needed to be made; if there were any problems, the customer could be charged with the cost of correcting them. The fact that the trade-in value might thus have been subject to change does not rule out the existence of a binding agreement. See § 2-305(1) of the Michigan Uniform Commercial Code, M.C.L. § 440.2305(1) ("The parties if they so intend can conclude a contract for sale even though the price is not settled.")
 
 
 19
 It was the understanding of the district court that LECO had been sued by the personal injury claimants not as an owner of the vessel but as the employer of Mr. Fritch, the allegedly negligent operator. The complaints filed in the state court are not part of the record here, so we have not been able to verify the district court's understanding on this point. Whatever the personal injury claimants' legal theory may have been, however, it seems to us that LECO's status as an owner depends on its relationship to the vessel and to the previous owner, and not on the wording of pleadings filed by strangers to the purchase agreement. If, as we hold, LECO was an "owner" of the boat at the time of the accident, its ownership interest obviously could not have been terminated by the subsequent filing of a complaint charging it with liability on a respondeat superior theory. Whether the wreck of the "All Time High" occurred "without the privity or knowledge" of LECO is a different question, of course, and we intimate no view as to how that question ought to be decided.
 
 
 20
 The judgment of the district court is REVERSED, and the case is REMANDED for further proceedings not inconsistent with this opinion.
 
 
 
 *
 The Honorable Thomas M. Reavley, Senior United States Circuit Judge for the Fifth Circuit, sitting by designation